**UNITED STATES of America,**

v.

**Charles Savage SCHOFER, Defendant.**

**No. 69 CR 362.**

United States District Court,
E. D. New York.

Dec. 15, 1969.

Memorandum and Order Feb. 5, 1970.

Edward John Boyd, V, Brooklyn, N.Y. (Edward R. Neaher, U. S. Atty., of counsel), for the Government.

Edward J. Kelly, Huntington Station, N.Y. (Milton Adler, New York City, of counsel), for defendant.

DOOLING, District Judge.

Defendant has been indicted (1) for knowingly possessing a "firearm" within the definition of Internal Revenue Code § 5845(a) which had not been registered to him as required by Section 5841 of the Code—a violation of Section 5861(d) of the Code; and (2) for willfully and knowingly transferring a "firearm" in violation of Section 5812 of the Code (which forbids the transfer of a "firearm" unless the transferor applies for Treasury Department approval of the transfer); such a transfer violates Section 5861(e).

Defendant moves to dismiss the indictment on the ground that the Code provisions, enacted by the National Firearms Act (Title II of Public Law 90–618, 90th Congress, 82 Stat. 1213) are violative of defendant's Fifth Amendment right not to be required to incriminate himself. Haynes v. United States, 1968, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923.

*Haynes* found that a timely asserted claim of privilege under the Fifth Amendment furnished a complete defense to the crime of former Section 5851, that is, possessing a firearm that had not

been registered as required by former Section 5841. The Court noted that the National Firearms Act provisions of the Internal Revenue Code were so limited as to guarantee that "only weapons used principally by persons engaged in unlawful activities" were taxed, and that the tax on the making and transfer of the firearms was supplemented by comprehensive provisions assuring that any possessor fully identified himself as the maker or transferee of the firearm either by himself registering it (Section 5841), or by furnishing his transferor with an order form (a copy of which would be filed with the Treasury Department) fully identifying the transferee (Section 5814(a), (b)), or by filing a notification of his intention to make the weapon and prepaying the tax before making the weapon (Section 5821(e)). The Court pointed out that any failure to comply with any requirement of the Act was a felony (Section 5861) and that, specifically, Section 5851 made it a crime to receive or possess a weapon made or transferred in violation of specified sections of the law (including Sections 5821 and 5814) or "to possess any firearm which has not been registered as required by Section 5841." *Haynes* was indicted under Section 5851 for knowingly possessing a firearm not registered under Section 5841. The Court put the problem as one of determining, *first,* whether a conviction under Section 5851 for possessing an unregistered weapon was substantively different from one under Section 5841 for failing to register a possessed weapon, and, if not, *second,* would compliance with Section 5841 have compelled *Haynes* to provide incriminatory evidence. *Haynes* argued that the two sections were one in substance, that a Section 5841 conviction would punish the defendant for failing to incriminate himself, and that, therefore, a timely claim of Fifth Amendment privilege should provide a complete defense. The Government argued that Section 5851 was meant to punish only the acquiring of an unregistered firearm whereas Section 5841 was meant to punish only

the *present* possessor who failed—after acquiring it—to register his possession. The Court, however, rejected the Government's interpretation of Section 5851 as directed only to getting possession of a weapon that was already an unregistered weapon when possession was acquired; the Court declined, that is, to limit Section 5851 to possession of the kind of firearm that had already become an illicit weapon before the defendant acquired it. The Court interpreted Section 5851 as applying to any possessor who up to the time at which he was charged had not registered the firearm. So interpreted, the elements of the offense of Section 5851, which explicitly made it an offense to possess a firearm not "registered as required by Section 5841," were held to be identical with those of Section 5841. Possession and non-registration were, the Court observed, equally fundamental ingredients of both offenses. The Court rejected the suggestion that Section 5841 might be read as creating a status of (manifestly) illegal possession which, if one (voluntarily) assumed it, automatically waived the Fifth Amendment privilege.

Turning, then, to the question whether enforced registration would have compelled self-incrimination, the Court found in the statutory scheme a high but not inevitable correlation between obligation to register and violations since the registration required to avoid Section 5851 prosecution would mainly be by possessors who had obtained the firearm "without complying with the Act's other requirements" and who "are immediately threatened by criminal prosecutions under" Sections 5851 and 5861 (*e. g.*, for having failed to furnish a Section 5814(a) order form to the transferor upon the acquisition, or by failing to file under Section 5821(e) a declaration of intention to make the weapon—such failures preventing the possessor from claiming the exemptive benefit of the second sentence of Section 5841 and being themselves delinquencies punishable under Section 5861). In addition, under Section 5851, the Court pointed

out, proof of possession shifts to defendant the burden of explaining the possession. The Court rejected an argument that the statute was validated by the fact that innocent possessors could be imagined who could register the weapons with impunity, reiterating that the statute was directed at a class suspect of criminality and in an area of activity permeated with criminal statutes. However, the Court concluded that this last circumstance prevented total invalidation of Section 5851 on its face and it held that accused possessors were sufficiently protected if permitted to present their Fifth Amendment privilege as a defense. The Court declined to avoid the problem by restricting federal and state use of registration disclosures in criminal cases, particularly in view of Section 6107 of the Code authorizing disclosure of lists of excise taxpayers to state prosecutors.

The Gun Control Act of 1968 (Public Law 90–618, 90th Congress) provides in Title I, amending Title 18, Crimes and Criminal Procedure, for licensing dealers in weapons inclusively defined and dealers in "destructive devices," for the regulation of the dealing in such weapons and devices, and for the prohibition and punishment of acts subversive of the scheme of control through licensing and regulation. Title II, the National Firearms Act, like its predecessor Chapter 53 of the Internal Revenue Code, deals with the classes of firearms peculiarly identified with unlawful activities. While the definitions are not the same as those of former Section 5848 (and the "destructive device" definition is entirely new), the changes appear to amend the law in the direction of its earlier aim and not to broaden it in the direction of including firearms which are characteristically owned by law-abiding citizens.

However, Chapter 53 as now rewritten relieves possession of an unregistered weapon of that "high correlation" between the obligation to register and violation noted by *Haynes,* for under the present provisions the possessor is not, as such, under a duty to register. The duty to register attaches to manufacturers, importers, transferors and makers of firearms; notification to the Treasury Department must precede manufacture, and Treasury Department authorization to import, make or transfer a firearm must be obtained before one imports, makes, or transfers the firearm, and such notification or authorization effects registration (Sections 5841(b), (c), 5812, 5822, 5844 Internal Revenue Code, as amended). The scheme of registration is such that any possessor of any firearm will be identifiable from the Central Registry if the law has been complied with by manufacturers, importers, makers and transferors. But the scheme of the statute does not, as the predecessor did, require possessors of unregistered firearms to effect registrations that would in the general (but not necessarily every) case identify an earlier offense and identify the registrant as the one who committed it. For example, under old Section 5851 it was illegal to possess an unregistered firearm, under old Section 5841 a possessor was required to register his possession unless (in effect) the weapon had been registered to him; a transferee-possessor under old Section 5814 could lawfully become such only by filling up an official order form that fully identified him (with fingerprints and photograph); and a maker-possessor had to have filed a notification of intention to make. Hence the general case of unregistered possession was the case in which the possessor had become the transferee of the firearm without issuing the order form of Section 5814 or had become the maker-possessor without filing a notification of future making under Section 5821(e); indeed his criminal neglect of these duties fastened on him a duty to register under old Section 5841 and if he failed that duty he was indictable under old Sections 5851 and 5861. The amended Chapter 53 sets no such trap. A transferee does not have to fill up an order form for filing. Section 5812 imposes on the transferor the duty of obtaining approval of a proposed transfer (which is to be

denied if the transfer, receipt or possession would place the transferee in violation of law), and it forbids the transferee to take possession unless the Treasury Department has approved the transfer and registration of the firearm. Similarly (as before) the maker must obtain authorization to make firearms before doing so (Section 5822), but one acquiring a firearm from a maker would be a transferee and under no obligation of registration, that obligation resting on the maker-transferor; a maker-possessor who had not complied with the statutory notification procedure would not as a possessor be under a duty to register and so disclose his earlier default, although he would perhaps be indictable both for the violation based on non-compliance with Section 5822 (see Section 5861(f)) and as a possessor of an unregistered firearm.

■ In its essential operation the present statute appears to be free of the defect found in old Section 5851. So far as the possessor is concerned, he is indictable only for his voluntary election to possess a firearm that is contraband because it is unregistered (Section 5872). None of the registration requirements as schematized in the statute is such that it inherently requires self-accusatory disclosures by the possessor of his own earlier violations of any of the provisions of the National Firearms Act.

Count 2 of the indictment charges the defendant with transferring a firearm without complying with Section 5812, which in turn requires the obtaining of a Treasury Department authorization, issued on the transferor's application before the transfer is made. Nothing in the statutory provision by its very nature would of necessity require every transferor to disclose an illegal possession or making by applying for leave to make a transfer, for the firearms are not made *per se* illegal, and they could have been—from the standpoint at least of federal law—legally made, imported or sold if those acts are openly done, duly reported—and duly tax-paid. The only question is whether there is an in-

validating degree of probability that compliance with Section 5812 would disclose an earlier making that was illegal under Sections 5822, 5841, 5861(f), or an earlier importation under Section 5841, or an earlier transfer illegal under Sections 5812, 5841, 5861(e). It is difficult to suppose that what the Conference Report characterizes as "gangster-type weapons" (Conference Report No. 1956, 90th Cong., 2d Sess., 1968 U.S. Code Cong. & Ad.News, p. 4434) will be made, imported or transferred openly under Treasury Department authorization to any significant extent. The legislation owes its existence to a conviction that traffic in such firearms is in the main an utterly criminal traffic and that the traffic must be a secret traffic to survive; certainly the statute was not passed to garner revenue, but was enacted to drive the traffic out of existence by imposing on it requirements of public disclosures that it could not meet and survive as a traffic and which it could not ignore except at the risk of heavy criminal penalties. Once it is concluded—as the Supreme Court has concluded—that a tax statute can lawfully be enacted with the aim of destroying the activity professedly taxed by imposing on it tax and report duties supported by penal sanctions that lawful business enterprises alone can avoid through compliance, only narrower questions, like that examined in *Haynes*, survive. The transfer duty and punishment of Sections 5812, 5861(e) would seem by an extension of *Haynes* that appears to be logically inescapable to condemn the Second Count unless it is rescued by Section 5848 and by the repeal of Section 6107 (Public Law 90–618, Section 203). *Cf.* Marchetti v. United States, 1968, 390 U.S. 39, 44–48, 88 S.Ct. 697, 19 L.Ed.2d 889; Grosso v. United States, 1968, 390 U.S. 62, 66, 68–69, 88 S.Ct. 709, 19 L.Ed.2d 906.

Section 5848 provides that no information or evidence obtained from an application, registration or records required by the Act to be submitted or retained by a natural person shall "be used, direct-

ly or indirectly, as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence." The section certainly reinforces the validity of the statute so far as it makes possession of an unregistered firearm a crime. (So too does the abandonment of the presumption of guilt arising from unexplained possession that was a part of former Section 5851.) But when invoked to validate a statute which requires the transferors of gangster-type weapons to register their transfers, Section 5848 appears inadequate in failing to take account of what was said in. *Marchetti* (390 U.S. at 53–54, 88 S.Ct. at 706) about the effect of significant enhancement of "the likelihood of * * * prosecution for future acts." The Court explicitly declined to hold that "the force of the constitutional prohibition" did not extend to a "confession" of "purpose" to engage in illegal transactions in the future. The determinant, the Court said, was not "mere time" but "the substantiality of the risks of incrimination." For example, compliance with new Section 5812 might in an indefinable number of cases expose the transferors of such firearms to the charge of acting as accessories to crimes of violence later committed by the transferees.

It may be that "firearm" now includes more weapons that can be innocently dealt with than the Act included before the amendments; the Conference Report reflects that view of the 1968 changes (Conference Report No. 1956, 90th Cong., 2d Sess., 1968 U.S. Code Cong. & Ad. News at pp. 4434, 4435). But the definition of "firearm" in the National Firearms Act contrasts sharply with that of "firearm" in 18 U.S.C. § 921(a) (3), concurrently enacted, which includes "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive"; the Title 18 definition is lucidly inclusive of all the common weapons of the sportsman and householder. And the whole of Chapter 53 contrasts startlingly with "PART III—FIREARMS" of Chapter 32 of the Internal Revenue Code; that Part imposes a 10% excise tax on pistols and all revolvers and a tax of 11% on all other firearms, shells and cartridges (Section 4181) except "firearms" taxed by Section 5811 (the National Firearms Act tax on transfers of firearms). The "firearms" of Chapter 53 thus remain those identifiable generally and broadly if not exclusively with criminal activities, while other enactments tax and regulate (even in the general criminal perspective) the firearms that are generally innocently owned and used. No doubt Section 5812 could apply to one who failed to register his further transfer of a firearm which was registered when he obtained it, for then his combined acts of effecting and concealing a further transfer would mark his criminal conversion of the firearm into contraband. His failure to register would then itself be integral to the criminality of his conduct and not rather a failure to furnish evidence of possible complicity in future wrongs.

*Marchetti, Grosso, Haynes,* and Leary v. United States, 1969, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57, emphasize the Fifth Amendment consequences of the federal practice of making the "tax" information available to state and federal law enforcement officers both under Section 6107 of the Code (authorizing disclosure of lists of certain classes of excise taxpayers) and otherwise. Repeal of Section 6107 shuts off one convenient avenue of disclosure, but it does not appear that there is any effective general restraint on the making available to law enforcement officers of tax information.

Minor v. United States, 1969, 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 does not deny the defendant the privilege defense in this case, for here the statute, while it is equally unreal if viewed as a statute setting up a scheme of compliance with a real-world counterpart of expectable general compliances, does unequiv-

ocally require of the accused a directly self-accusatory filing and specifically punishes the failure to make the filing, for essential elements of the offense charged are the transfer and the transferor's failure to make the filings of Section 5812.

It is concluded that the constitutional privilege, timely asserted by defendant's motion, is a good defense to Count 2 and that Count 2 must be dismissed.

A question which must be resolved in the present case on Count 1 is whether or not the materials involved in the indictment do constitute a "firearm."

On defendant's motion to dismiss, it is

Ordered that the motion is denied as to Count 1 and granted as to Count 2.

## MEMORANDUM AND ORDER

At a Rule 12(b) evidentiary hearing, held January 21, 1970, to determine what comprised the "firearm" of Count 1 of the indictment the following facts were ascertained:

The ten sticks of dynamite referred to in Count 2 were in a brown paper bag, as were the two lengths of fuse or primer cord and the two blasting caps were in a metal box. All three elements were in an automobile and the metal box containing the caps was under a seat of the car.

The materials referred to in Count 1 consisted of dynamite, safety fuse or primer cord, and blasting caps. 38 sticks of dynamite were in a metal chest; the safety fuse was on a reel or roll contained in a brown paper bag, and the blasting caps were in a metal box. One additional stick of dynamite was found in a lot. The 38 sticks of dynamite and the reel of safety fuse were in the home of a female friend of the defendant and there were no blasting caps in that house. The only blasting caps were those in the metal box under a seat in the defendant's car.

The materials were not assembled for detonation, and the only materials involved were commercial materials. The three types of articles, dynamite, fuse, and caps, are all of a kind generally used for industrial blasting. No additional materials were found or associated with the dynamite, fuse and caps to change their nature or their usual mode of operation in industrial applications. They could be readily united to produce an immense explosive force, but only in one of the usual industrial ways, that is, by putting blasting caps on a dynamite stick, attaching a length of safety fuse to the cap, and lighting the free end of the safety fuse. That procedure was the one used in destroying the dynamite, about 25 sticks being detonated at a time by capping, fusing and lighting one stick of dynamite in each lot.

The question, then, is three-fold: *first*, can such possession of such articles so located be indicted as possession of an illicitly unregistered firearm? *Second*, if the answer to *"First"* is affirmative, then is not the intention referred to in Section 5845(f) (3) an indispensable element in the conclusion that such industrial materials so possessed may be a "destructive device" and therefore a firearm? And *third*, if that is so, must not the indictment allege and Government prove the intention?

The statute's terms indicate that it was not intended to reach such ordinary commercial materials through "intent" alone. The language implies at minimum the presence of parts "intended" to "convert" any "device" into a destructive device akin to those referred to in § 5845(f) (1) and (2), all of which have definite non-industrial characters. The articles here could be assembled only into the familiar industrial blasting charge; the risk of anti-social use here was not inherent in the articles or in any suitability they had for "conversion" to a non-industrial weapon or "mine," but in the potential perversion of their use. The potential is rather that of the parked motor vehicle that can be made a lethal weapon by perversion of its purpose. Since the statute is aimed at the kind of evil articles it describes, and not at evil

perversions of the use of articles of innocent commerce without alteration of their nature or mode of operation, it must be concluded that the articles were not within the statute and that the indictment is ill-founded. In the circumstances it could at best become valid by alleging an intent that is indispensable if the alternative interpretation of the statute is adopted. On that view of the statute, the indictment, Count 1, is invalid on its face. Accordingly, it is

Ordered that the case be set for hearing immediately before trial on a motion to dismiss on the ground that such possession of such articles is not indictable in the form of Count 1.