**UNITED STATES of America,
Plaintiff and Appellee,**

v.

**Richard J. OBA, Defendant and Appellant.**

**No. 26481.**

United States Court of Appeals,
Ninth Circuit.

Aug. 23, 1971.

Rehearing Denied Sept. 29, 1971.

Barnes Ellis (argued), Portland, Or., for defendant-appellant.

Michael Abbell (argued), Dept. of Justice, Washington, D. C., Sidney I. Lezak, U. S. Atty., Charles Turner, Asst. U. S. Atty., Portland, Or., for plaintiff-appellee.

Before BROWNING and CARTER, Circuit Judges, and BYRNE,* District Judge.

WILLIAM M. BYRNE, District Judge:

This is an appeal by appellant Oba from his conviction upon a plea of guilty to Counts One and Two of an indictment charging him with possessing an unlawfully made firearm and with unlawfully transferring the same firearm in violations of 26 U.S.C. § 5861(c) and (e), respectively. At the time of pleading guilty, Oba retained, with permis-

sion of the Court, two legal questions for appeal, viz., (1) Did the indictment fail to state facts sufficient to constitute an offense, and (2) Would the National Firearms Act, as applied to him, force him to incriminate himself as to future acts.

On appeal, appellant contends that the object described in the indictment ("seven sticks of dynamite wrapped with copper wire and equipped with a length of black dynamite fuse, together with dynamite caps * * * ") does not come within the definition of "destructive device" found in 26 U.S.C. § 5845 (f).[1] The thrust of appellant's argument is that the object is, intrinsically, not a weapon and that it can only be labelled a "destructive device" if that is the ultimate subjective intent of the possessor or transferor.

On June 19, 1968, the Omnibus Crime Control and Safe Streets Act (Pub.L. 90–351, 82 Stat. 197 (1968)) was signed by the President. Title IV of the Act, 18 U.S.C. §§ 921–928, which related to the control of firearms in commerce, defined "destructive device" as follows:

"The term 'destructive device' means any explosive, incendiary, or poison gas bomb, grenade, mine, rocket, missile, or similar device; and includes any type of weapon which

---

* Honorable William M. Byrne, United States District Judge, Central District of California, sitting by designation.

1. § 5845. *Definitions*

" * * * *

"(f) *Destructive device.*—The term 'destructive device' means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable

for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term 'destructive device' shall not include any device which is neither designed or redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684 (2), 4685, or 4686 of title 10 of the United States Code; or any other device which the Secretary of the Treasury or his delegate finds is not likely to be used as a weapon; or is an antique or is a rifle which the owner intends to use solely for sporting purposes."

will or is designed to or may readily be converted to expel a projectile by the action of any explosive and having any barrel with a bore of one-half inch or more in diameter."

Specifically excluded from this definition were devices "not designed or redesigned or used or intended for use as * * * weapon(s)."

Later that year, the Congress, in order "to provide for better control of the interstate traffic in firearms" enacted the Gun Control Act of 1968. The bill which was approved by the Conference Committee and later the Congress, included amendments to the National Firearms Act, 26 U.S.C. §§ 5801–5862, as well as to the Omnibus Act. This bill's formulation as to what constitutes a "destructive device" is set forth in Footnote 1. The same definition of "destructive device" was applied to the amended Omnibus Act as well as the revised National Firearms Act.

■ A clear reading of the Statute coupled with an examination of the indictment to which appellant entered a guilty plea, demonstrates that the object was a destructive device. Subparagraph (3) of § 5845(f) provides that a "destructive device" includes "any combination of parts either *designed* or *intended* for use in *converting any device* into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled." (Emphasis added.) Simply stated, a device may be "converted" into a destructive device as defined in Subparagraphs (1) and (2) by way of "design or intent." See S.Rep.No.1501, 90th Congress, 2d Sess., P. 47 (1968).

Here in his guilty plea appellant admitted that the device consisted of seven sticks of dynamite wrapped in copper wire and equipped with fuse and blasting caps.[2] He stated that his intent was to dynamite the City of Eugene, Oregon

and admitted that the purpose of the device was to bomb and destroy the property of others. He also stated that in Eugene, Oregon, in May of 1969, he transferred the device to one Robert Caufield with instructions to detonate it on certain premises in Eugene, Oregon. In sum, that the said object was a "destructive device" as defined in 26 U.S.C. § 5845(f) is beyond controversy.

In light of the nature of this device and its admitted purpose, it seems absurd to even question its inclusion within the definition of "destructive device" approved by Congress, or to assert that it is not a weapon. The definition excluded "any device, although originally designed *for use* as a weapon, which is *redesigned* for use as a signaling, pyrotechnic, line throwing, safety, or similar device." (Emphasis added). Here, appellant's own admission establishes that the weapon in issue had not been redesigned for any such use.

■ As an adjunct to this discussion, we point out that the exception created by Congress, i. e., "The term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon," in substance constitutes an affirmative defense, which, if asserted, must be negated beyond a reasonable doubt by the prosecution. Here, the appellant's guilty plea resulted in the waiving of such defense, thus relieving the government of this prosecutorial burden. Hughes v. United States, 371 F.2d 694 (8th Cir. 1967) ; United States v. Ptomey, 366 F.2d 759 (3rd Cir. 1966) ; Davis v. United States, 347 F.2d 374 (9th Cir. 1965).

■ Turning to appellant's claim that the National Firearms Act, as amended, violated his privilege against self-incrimination, our analysis need go no further than pointing out that the Supreme Court has ruled to the contrary. In United States v. Freed, 401 U.S. 601,

---

2. By contrast, in United States v. Schofer, 310 F.Supp. 1292, (E.D.N.Y.1970) relied upon by appellant, the sticks of dynamite, fuse and blasting caps had not been con-

verted into a bomb, but were instead, each located in a separate container. In short, the acts of conversion present in the instant case, were absent in *Schofer*.

606, 91 S.Ct. 1112, 1116, 28 L.Ed.2d 356 (1971), the Court held "that the amended Act does not violate the Self-Incrimination Clause of the Fifth Amendment." In so holding, the court specifically rejected the contention set forth before us that compliance with the transfer provision of 26 U.S.C. § 5812(a) and the tax payment provision of 26 U.S.C. § 5811(a) is an open invitation to the prosecutorial agencies of government to one day use this information to secure a conviction for a later act of criminality. Because of the prophylactic language of 26 U.S.C. § 5848(a) [3] and the "practice" of the Internal Revenue Service of not making available to such agencies, state as well as federal, information resulting from such compliance, the court was of the view that such a contention was wholly without viability:

> "The argument, however, is that furnishing the photograph and fingerprints will incriminate the transferee in the future. But the claimant is not confronted by 'substantial and "real" ' but merely 'trifling or imaginary hazards of incrimination'—*first* by reason of the statutory barrier against use in a prosecution for prior or concurrent offenses, and *second* by reason of the unavailability of the registration data, as a matter of administration, to local, state, and other federal agencies. Marchetti v. United States, supra, [390 U.S. (39)] 53–54, 88 S.Ct. [697] 705 [19 L.Ed.2d 889]. Cf. Minor v. United States, 396 U.S. 87, 94 [90 S.Ct. 284, 287, 24 L.Ed.2d 283]. Since the state and other federal agencies never see the information, he is left in the same position as if he had not given it, but 'had claimed his privilege in the absence of a * * * grant of immunity.' Murphy v. Waterfront Comm'n, 378 U.S. 52, 79, [84 S.Ct. 1594, 1610, 12 L.Ed.2d 678]. This, combined with the protection against use to prove prior or concurrent offenses, satisfies the Fifth Amendment requirements respecting self-incrimination."

401 U.S. at 606, 91 S.Ct. at 1116.

See, United States v. Jones, 446 F.2d 12 (9th Cir. 1971); United States v. Harflinger, 436 F.2d 928 (8th Cir. 1970); United States v. Ramsey, 429 F.2d 565 (5th Cir. 1970).

We affirm the judgment of conviction.

BROWNING, Circuit Judge (dissenting):

Appellant was convicted of possessing and transferring a "firearm" in violation of the National Firearms Act, as amended by Title II of the Gun Control Act of 1968, 26 U.S.C. § 5801 et seq. The "firearm" is described in the indictment as "a destructive device consisting of seven sticks of dynamite wrapped with copper wire and equipped with a length of black dynamite fuse, together with dynamite caps." Appellant contends that this is not a "firearm" within the meaning of the Act and therefore the indictment does not state facts sufficient to constitute an offense.

Appellant argues that the Act applies only to gangster-type weapons and major military ordnance—two objectively recognizable types of weaponry not commonly associated with lawful private activity; that the object described in the indictment is commercial blasting material assembled in the manner in which it is ordinarily assembled for use in law-

---

3. 26 U.S.C. § 5848(a) provides, in pertinent part, as follows:

"No information or evidence obtained from an application, registration, or records required to be submitted or retained by a natural person in order to comply with any provision of this chapter or regulations issued thereunder, shall * * * be used, directly or indirectly, as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence."

ful industrial demolition,[1] and not a weapon of the types identified in the statutory definitions; and that the district court erred when it held that commercial blasting material assembled for detonation in the usual way was converted into a "firearm" within the meaning of the statute because the appellant intended to use it for unlawful purposes.[2]

Only one court has considered the question of statutory interpretation raised by appellant. In United States v. Schofer, 310 F.Supp. 1292 (E.D.N.Y. 1970), the court held that commercial dynamite, fuses, and caps did not constitute a "firearm" within the meaning of the statute, regardless of the possessor's intent. Judge Dooling said (310 F.Supp. at 1297–1298):

> "The statute's terms indicate that it was not intended to reach such ordinary commercial materials through 'intent' alone. The language implies at minimum the presence of parts 'intended' to 'convert' any 'device' into a destructive device akin to those referred to in § 5845(f) (1) and (2), all of which have definite non-industrial characters. The articles here could be assembled only into the familiar industrial blasting charge; the risk of anti-social use here was not inherent in the articles or in any suitability they had for 'conversion' to a non-industrial weapon or 'mine,' but in the potential perversion of their

use. The potential is rather that of the parked motor vehicle that can be made a lethal weapon by perversion of its purpose. Since the statute is aimed at the kind of evil articles it describes, and not at evil perversions of the use of articles of innocent commerce without alteration of their nature or mode of operation, it must be concluded that the articles were not within the statute and that the indictment is ill-founded." [3]

Judge Dooling's conclusion that items of the kind in question are not "firearms" is fully supported by the purpose, language, and history of the Act.

## I

The National Firearms Act imposes heavy taxes and severe controls upon transactions involving the "firearms" to which the Act applies—except transactions with the United States, a state or its political subdivisions, or an official police organization. 26 U.S.C. §§ 5851, 5853. Every importer, manufacturer, and dealer in such "firearms" must register annually (§ 5802) and pay a special occupational tax (§ 5801). A tax of $200 is imposed on each "firearm" made (§ 5821), and upon each subsequent transfer (§ 5811). Written application must be made to the Secretary of the Treasury and prior approval obtained before a "firearm" may be made (§ 5822), and before each subsequent transfer (§ 5812). Each manufacturer, importer,

---

1. The government does not dispute this characterization of the object involved. The complaint describes the explosive material as "Dupont Logger Dynamite"; and it is a matter of common knowledge that the combination of dynamite, fuse, and caps described in the indictment is that commonly employed in industrial demolition.

2. In holding that appellant's intent to use the assembled commercial blasting material unlawfully made the material a "firearm" within the meaning of the statute, the trial court said, "There's certainly nothing unusual in the law to characterize an object one way or another depending on the intent of the possessor. Many articles in the criminal law have one legal

characteristic or another, depending on the intent of the possessor. And indeed in this particular act, the statutory definition itself uses the word 'intend.'"

3. Alternatively, Judge Dooling held that the intention referred to in section 5845 (f) (3) would be an indispensable element of the offense, and the indictment would be invalid on its face because this intent was not alleged. 310 F.Supp. at 1298.

The majority distinguishes Schofer on the ground that the dynamite, fuse, and blasting caps had not been assembled into a single device as they had in the present case. Majority opinion, n. 2. If the difference has significance, it argues against the majority's position. See note 8.

and maker is required to register each "firearm" he manufactures, imports, or makes; and each subsequent transferor of a "firearm" must register the transfer to the transferee (§ 5841). The manufacturer, maker, or importer must identify each "firearm" by a serial number, or by other means specified by the Secretary (§ 5842). Importers, manufacturers, and dealers must keep records and render returns to the Secretary regarding importation, manufacture, making, receipt, sale, or other disposition of "firearms" (§ 5843). Those who fail to comply with the Act in any way (§ 5861) are subject to lengthy prison terms and heavy fines (§ 5871), and to the forfeiture of the "firearm" involved (§ 5872).

The Act is obviously designed to discourage any dealing in "firearms" covered by the Act, except with governmental entities.

## II

It is not surprising, therefore, to find that the National Firearms Act applies only to two narrow, precisely defined groups of highly dangerous weapons which Congress thought to be, in themselves, so amenable to antisocial use by private parties as to justify the strictest regulation.

Prior to 1968, the Act was commonly known as the "Machine Gun Act." It applied to carefully identified weapons (short-barreled shotguns and rifles, machine guns, certain "deceptive" weapons concealable on the person, and gun silencers) which were "used principally by persons engaged in unlawful activities." Haynes v. United States, 390 U.S. 85, 87, 88 S.Ct. 722, 725, 19 L.Ed.2d 923 (1968). At that time the "primary purpose of

[the Firearms Act] was to make it more difficult for the gangster element to obtain certain types of weapons. The type of weapon with which these provisions are concerned are the types it was thought would be used primarily by the gangster-type element." H.R.Rep.No. 914, 86th Cong., 1st Sess. 2 (1959), quoted at 390 U.S. at 87 n. 4, 88 S.Ct. at 725.

The Crime Control Act of 1968 amended the National Firearms Act to broaden its coverage in two respects. First, a number of weapons were added to the list of "gangster-type" weapons covered by the Act, namely, machine gun kits and parts, smoothbore pistols and revolvers designed to fire shotgun shells, and concealable combination rifles and shotguns. Second, the coverage of the Act was extended to include an entirely different type of weapon: "a destructive device."

This second addition was prompted by the influx or surplus military weapons into this country from other nations. S.Rep.No.1501, 90th Cong., 2d Sess. 24 (1968); 114 Cong.Rec. 26888 (1968) (remarks of Senator Dodd); 35 Brooklyn L.Rev. 433, 438. Cf. S.Rep.No.1097, 90th Cong., 2d Sess. 77–78. It was intended to bring within the Act items of heavy military ordnance that had no legitimate private use and constituted a substantial threat to public safety, like the gangster-type weapons theretofore covered by the Act.

The "firearms" covered by the Act were referred to in committee hearings, committee reports, and on the floor of Congress as falling into these two classes: "gangster-type weapons," and "destructive devices" described as "military-type weapons" or "primarily weapons of war," having, it was repeatedly said, no appropriate private use.[4] Thus, Sena-

4. See, e. g., Hearings before the Committee on Ways and Means, House of Representatives, 89th Cong., 1st Sess. (July 1965), Proposed Amendments to Firearms Acts 3–4, 29, 34, 35, 48–50; Hearings before the Subcommittee to Investigate Juvenile Delinquency of the Committee of the Judiciary, U.S. Senate, 90th Cong., 1st Sess. (July 1967), Federal Firearms Act 51–52, 54, 1087, 1090; S.Rep.No.1501, 90th Cong., 1st Sess. 1, 25, 26, 28 (1968); S. Rep.No.1097, 90th Cong., 2d Sess. 76 (1968); 114 Cong.Rec. 26888, 26896, 26898, 27133, 30578 (1968). Some of the cited references relate to the similar definition of "destructive device" in the companion Federal Firearms Act.

tor Hruska, presenting the amended definition of "firearm" to the Senate, stated: "There is universal agreement that rockets, bazookas, antitank guns, heavy field artillery, and the like should be strictly controlled, for there are no legitimate sporting uses for these weapons. Since 1934, automatic weapons, such as machine guns and sawed-off rifles and sawed-off shotguns have been effectively regulated. * * * [D]estructive devices would be placed within this regulatory framework." 114 Cong.Rec. 26896 (1968).

### III

There is additional evidence that in extending the National Firearms Act to "destructive devices," Congress intended to add only military ordnance having little or no appropriate civilian use, and not such common commercial explosives as those involved here. The Omnibus Crime Control and Safe Streets Act of 1967, a predecessor proposal which was before the Senate less than six months before the passage of the Crime Control Act of 1968, included a definition of destructive devices not unlike that later added to the National Firearms Act by the Crime Control Act of 1968. In the course of debate on the Omnibus Act of 1967, the following exchange occurred between Senator Metcalf of Montana and Senator Dodd, a member of the Judiciary Committee representing the proponents of the Act (114 Cong.Rec. 12448 (1968)):

"Mr. METCALF. Let me ask a question before our time runs out. The Senator has included explosive devices under the destructive portions of the act.

Mr. DODD. Yes.

Mr. METCALF. Does that mean that dynamite for mines or construction companies, and so forth, is included?

Mr. DODD. No, it does not, Senator. What I had in mind was things like hand grenades and other types of mines and bombs.

Mr. METCALF. Antipersonnel mines.

Mr. DODD. Yes.

Mr. METCALF. So that a legitimate prospector——

Mr. DODD. He is not included under the provisions at all.

Mr. METCALF. He could get dynamite?

Mr. DODD. This provision has nothing to do with that type of business. It specifically excludes such items which would be used in commercial construction or business activities."

### IV

The language of the National Firearms Act strongly supports the inference that the Act is applicable only to the gangster-type weapons and military ordnance specifically described in the Act, and does not extend to ordinary commercial blasting materials such as those involved here.

The operative provisions of the Act apply only to "firearms," a term defined in meticulous detail in section 5845(a), printed in the margin.[5] The first seven

---

5. "Sec. 5845. Definitions.
    For the purpose of this chapter——
    (a) *Firearm.*——The term 'firearm' means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) a muffler or a silencer for any firearm whether or not such a firearm is included within this definition; and (8) a destructive device. The term 'firearm' shall not include an antique firearm or any device (other than a machinegun or destruc-

subparagraphs of section 5845(a) list specific weapons, plus gun silencers or mufflers, all clearly adapted to criminal activity and inappropriate for lawful use. The government does not contend that the commercial explosive involved in this case comes within any of these subparagraphs of section 5845(a) describing gangster-type weapons.

"A destructive device" is added to the definition of "firearm" by subparagraph (8) of section 5845(a). The government argues that appellant's logger dynamite, fuse, and caps constituted such a device. "Destructive device" is defined in section 5845(f).[6]

Without exception, the devices listed in this statutory definition of "destructive device" are specific, objectively identifiable, highly destructive items of military ordnance having no proper use in private hands. Subparagraph (1) of section 5845(f) lists an explosive, incendiary, or poison gas bomb, grenade, rocket, or missile of substantial power; a mine; or a "similar device" (which must be taken to mean a military weapon similar to those listed. *See* S.Rep.No.1501, 90th

Cong., 2d Sess. 47). Subparagraph (2) of section 5845(f) also describes a specific military-type weapon—a gun having a barrel with a bore more than one-half inch in diameter.[7]

Obviously appellant's assembly of commercial dynamite, fuse, and caps is not a weapon of the type described in subparagraph (2). Neither does the government contend that it can be classified as one of the items of military ordnance listed in subparagraph (1).

The government's argument for coverage rests instead upon subparagraph (3) of the definition of "destructive device," which reads: "any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled."

The government's position appears to be that every "homemade" explosive device having substantial destructive power is brought within the Act by subparagraph (3) of section 5845(a), subject only to an affirmative defense that a

tive device) which, although designed as a weapon, the Secretary or his delegate finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon."

6. "Sec. 5845. Definitions.
For the purpose of this chapter—
*     *     *     *     *
(f) *Destructive Device.*—The term 'destructive device' means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes; and

(3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10 of the United States Code; or any other device which the Secretary of the Treasury or his delegate finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes."

7. Subparagraph (2) expressly excludes the only weapon that comes readily to mind that is not military-type ordnance and that is likely to have proper uses in private hands—a shotgun particularly suitable for sporting purposes.

particular device was "neither designed nor redesigned for use as a weapon."

The government's brief flatly states: "the device described in the indictment plainly falls within the definition of destructive devices since, when combined, the parts could have been used destructively. There is no need to show that the device was intended for such use."

By pleading guilty, the government asserts, appellant waived the right to show, by way of affirmative defense, that the device was not designed for use as a weapon.

There are two major difficulties with this interpretation of subparagraph (3) of section 5845(f).

1. The most obvious difficulty is that subparagraph (3) itself does not bring *any* device within the statute; instead it brings within the statute a collection of parts from which a device may be assembled. Moreover, the device referred to is one to which the statute would otherwise apply. Subparagraph (3) expressly provides that the device that may be assembled from the collection of parts must be "a destructive device as defined in subparagraphs (1) and (2)." Thus, unless the completed device would be one of the military-type weapons described in subparagraphs (1) and (2), the "combination of parts" from which the device is to be assembled is no more within the statute than the completed device would be. The evident purpose of subparagraph (3) is simply to foreclose a means of easy evasion by making it clear that the statute covers not only the completed devices described in sub-paragraphs (1) and (2) but also any collection of parts from which those same devices may be assembled.

Thus, subparagraph (3) does not apply to the present case at all, for the indictment describes a completed device rather than a collection of parts from which a device might be assembled.[8] And even if subparagraph (3) did apply, it would add nothing to the government's case, for unless the completed device described in the indictment is within subparagraphs (1) and (2) it cannot be within subparagraph (3).[9]

The legislative history indicates that the words of subparagraph (3) were intended to convey, in this respect, what they plainly say. As initially drafted, the language of subparagraph (3) was consistent, in one respect, with the meaning the government now attributes to this subparagraph. In the early draft the subparagraphs were lettered "A," "B," and "C" rather than numbered; and what is now subparagraph (3) listed as an included "destructive device" the following: "(C) any combination of parts designed and intended for use in converting any device into a destructive device." *See* S.1854, 90th Cong., 1st Sess. (1967). The General Counsel of the Treasury pointed out that this language "would define a type of destructive device in terms of 'destructive device' without the term itself having been completely defined." He suggested that the words "as defined in subparagraph (A) and (B)," be added to this third subparagraph of the definition. The suggestion was adopted, thus making it

---

8. Thus the fact that the dynamite, fuse, and caps involved in *Schofer* had not yet been assembled makes that case a stronger one for coverage under subparagraph (3) rather than the contrary, as the majority suggests. *See* note 3.

9. This distinguishes the "four empty bottles, a number of cloth strips and two gallon can of gasoline" involved in United States v. Davis, 313 F.Supp. 710, 711 (D. Conn.1970). That was, indeed, a mere collection of unassembled parts. Moreover, the device that defendant Davis intended to assemble from those parts was a "Molotov cocktail"—an effective though crudely made, military weapon, having no legitimate use in private hands. A Molotov cocktail is objectively regonizable as an "incendiary * * * bomb" within subparagraph (1), and is therefore a "destructive device" within the Act. Because the device defendant Davis intended to assemble was a "destructive device" within subparagraph (1), and *only* for that reason, the materials were "intended for use" in assembling a "destructive device" within subparagraph (3) and were therefore within the Act.

clear that the term "destructive device" included only those completed weapons listed in the first two subparagraphs of the definition, and combinations of parts from which those specific weapons could be assembled. Hearings before the Subcommittee to Investigate Juvenile Delinquency of the Committee on the Judiciary, U. S. Senate, 90th Cong., 1st Sess. (July-Aug. 1967) Federal Firearms Act 1087, 1089.[10]

2. A second major difficulty with the government's interpretation is that if subparagraph (3) were read, as the government reads it, to bring within the Act any combination of parts which, "when combined, * * * could have been used destructively," the coverage of the Act would be expanded in an absurd and wholly unintended manner.

The sum of the parts would exceed the whole. A completed weapon would not be within the statute unless it was listed in the definition of "firearm," but a combination of the parts of this same weapon *would* be within the Act if the combined parts could be used destructively—which would be true of virtually every conceivable weapon.

Moreover, since the government expressly rejects the notion that the character of a weapon as a "firearm" is determined by the intent of the maker or possessor, this miscellany of weapons and devices, drawn into the Act as "destructive devices" because they are capable of destructive use, "would be subject to all provisions of the act" (S.Rep.No.1501,

90th Cong., 2d Sess. 26). The miner or lumberjack who assembled dynamite, caps, and fuse for use in the normal course of his work would be required to register as a manufacturer and pay the prescribed tax, make written application to the Secretary of the Treasury for permission to assemble the materials, mark the assembled materials for identification as directed by the Secretary, register them with the Secretary, and so forth.

It is no answer to suggest, as the government does, that a defendant charged under the criminal sections of the Act may prove as an affirmative defense that the device involved was not "designed nor redesigned for use as a weapon" but rather for ordinary industrial blasting. Aside from the fact that "designed" quite clearly refers here to the physical structure of the device and not to the maker's subjective intent, it is simply not reasonable to assume that Congress intended to subject all those who use ordinary commercial explosives to this extremely rigorous regulatory scheme, enforceable by heavy criminal penalties, subject only to their ability to establish an affirmative defense in a criminal prosecution for violating the Act.

V

A further word should be said of the government's view, mentioned earlier, that by pleading guilty appellant waived any contention that the device involved was not within the statute.

10. The source of subparagraph (3) is reasonably clear, and lends additional support to this interpretation. It was copied from a proposed amendment to section 5845(b), expanding the prior definition of "machinegun" to include "any combination of parts designed and intended for use in converting a weapon into a machinegun." According to the Senate report, this addition covered "any combination of parts designed and intended for use in converting a weapon other than a machinegun into a machinegun; for example, so-called conversion kits. * * * This is an important addition to the definition of 'machinegun' and is intended to overcome problems encountered in the administra-

tion and enforcement of existing law." S.Rep.No.1501, 90th Cong., 2d Sess. 45–46 (1968). *See also* Conf.Rep.No.1956, 90th Cong., 2d Sess. 34 (1968). Thus in section 5845(b) the purpose of the new language was to reach parts that could be used to convert other weapons into machineguns, rather than to reach some new and different kind of "machinegun." By analogy, the purpose of the same language in subparagraph (3) of section 5845(f) was to reach parts that could be used to convert other devices into "destructive devices" as already defined, rather than to bring some new variety of "destructive device" within the Act.

The government's position rests upon its interpretation of the statute as embracing any device that may be used destructively through the term "destructive device," and as giving an affirmative defense to the innocent possessor of explosives for commercial purposes through the provision excluding "any device which is neither designed nor redesigned for use as a weapon."

As the government points out, the legislative history makes it clear that the latter provision does indeed create an affirmative defense. S.Rep.No.1501, 90th Cong., 2d Sess. 47 (1968). But appellant does not rely upon this defense. He contends, rather, that the government's interpretation of "destructive device" is wrong. If appellant's interpretation is correct, as it seems to be, the device described in the indictment is not a "destructive device" within the meaning of the statute, and the indictment therefore does not charge an offense under the statute. The question of affirmative defenses is never reached.

Appellant's contention that the indictment does not charge an offense would not be waived even by an unconditioned plea of guilty. Fed.R.Crim.P. 12(b) (2); Kolaski v. United States, 362 F.2d 847, 848 (5th Cir. 1966); Hopkins v. United States, 344 F.2d 229, 234 (8th Cir. 1965); Michener v. United States, 170 F.2d 973, 975 (8th Cir. 1948). Moreover, it is clear on this record that appellant intended to preserve the contention, and not to waive it; the guilty plea was tendered by appellant and accepted by the court on that express condition.[11]

---

11. Appellant moved to dismiss the indictment on the ground that it did not state facts sufficient to constitute an offense (C.T. 4). His memorandum in support argued that the object described in the indictment was not covered by the statute (C.T. 6–17). The government's answer argued that the object was within the statute (C.T. 19–26).

The court denied the motion on the ground that whether the object was within the statute would depend upon the possessor's intent (R.T. 2–22).

Later, appellant filed a supplemental memorandum arguing that *if* the possessor's intent determined whether the object was within the statute, then the statute as applied to appellant violated the Fifth Amendment (C.T. 58–63). Thereafter the motion to dismiss was argued again. In accordance with the district court's prior ruling, it was assumed that whether the object was within the statute depended upon the possessor's intent. The issue argued was whether the statute, so construed, violated appellant's Fifth Amendment rights (R.T. 37–64).

On the day set for trial, the court denied appellant's renewed motion to dismiss the indictment (R.T. 70–71). Appellant's counsel then informed the court that appellant wished to plead guilty (R.T. 71). This colloquy followed:

"THE COURT: You mean that he wishes to enter a guilty plea?

MR. ELLIS: Yes, Your Honor. This would be as a response to your ruling; and under the procedure in the Haynes case, it would be without prejudice to appeal (R.T. 71).

\* \* \* \* \*

MR. ELLIS: And I am relying on the Haynes case, which did say that if you moved to dismiss an indictment and that motion is denied, and under the relevant facts required for a finding of guilt as construed by the trial court you are guilty, you can then enter a plea of guilty but appeal that conviction on the legal questions raised in the motion to dismiss.

THE COURT: *Yes, there's no question about that.*

MR. ELLIS: And that is the procedure we intend to follow \* \* \*."

(R.T. 72) (emphasis added).

The court then questioned appellant in accordance with Rule 11. When the court asked whether appellant was pleading guilty "because you are guilty and for no other reason," appellant replied, "Yes, sir, *but with the right to appeal*" (R.T. 76) (emphasis added).

Appellant added the words "without waiver of right to appeal" (C.T. 41) to his "Petition to Enter Plea of Guilty" filed that day. Appellant's counsel also added the words "without waiver of right to appeal" to his accompanying certificate (C.T. 42). The court then entered an order accepting the guilty plea "as prayed for in the petition and as recommended in the certificate of his lawyer" (C.T. 42). Although the petition was changed in some respects to satisfy objections by the government (R.T. 76–77), the government

*See* United States v. Doyle, 348 F.2d 715, 719 (2d Cir. 1965).

## VI

Turning to the majority opinion, it will be noted that the majority's reading of subparagraph (3) of section 5845(f) differs from that of the government in at least one major respect. The majority reads subparagraph (3) as meaning that a device may be "converted" into a "destructive device" by the *intention* of the defendant to use the device to destroy the property of others unlawfully, an interpretation that the government explicitly rejects. *See* note 14.

The majority's reading of subparagraph (3) is, at best, strained. The context demonstrates that the "intention" referred to in that subparagraph is a purpose to convert a device into a "destructive device as defined in subparagraphs (1) and (2)," and not a general intention to create a device to destroy the property of others.[12] Thus, whether one emphasizes "designed" (with the government) or "intended" (with the majority), subparagraph (3) cannot be interpreted to bring within the statute any "destructive devices" other than those specifically identified in subparagraphs (1) and (2).

The majority relies upon the first two exclusionary provisions in section 5845 (f), namely, that "The term 'destructive device' shall not include," first, "any device which is neither designed nor redesigned for use as a weapon" or, second, "any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device."

The majority's point regarding the first exclusion is not clear. "As an adjunct to" its discussion, the majority recites this provision of the statute and notes that it provides an affirmative defense that appellant waived by pleading guilty.

If the majority means to suggest that by pleading guilty appellant waives his contention that the device described in the indictment does not come within the statute, the suggestion is untenable, for reasons already discussed (V).

If the majority's position is that the exclusion of "any device which is neither designed nor redesigned for use as a weapon" supports the majority's view that the *intention* of the defendant may convert ordinary commercial explosives into a "destructive device" within the statute, that position is also untenable, for the following reasons.

First, the legislative proceedings affecting the language of the first exclusion indicate that Congress deliberately excluded intention as a consideration in determining whether a device is subject to the statute.[13] The government agrees

---

made no objection to appellant's reservation, in court and in his petition, of his right to appeal on the grounds urged in his motion to dismiss the indictment.

12. There is an obvious reason for assigning a decisive role to a defendant's specific intention to assemble a "destructive device" from a collection of parts that is entirely consistent with a general congressional purpose that the Act apply only to objectively identifiable gangster- and military-type weapons. The objective physical characteristics of disassembled parts may not reflect the nature of the assembled device—a glass container, a strip of cloth, and gasoline, for example, do not necessarily signal the presence of an unassembled Molotov cocktail. The defendant's intention removes the ambiguity, establishing the character of the

combination of parts as an unassembled, or disassembled, gangster- or military-type weapon of the kind described in subparagraph (1) or (2).

If the parts themselves are designed to convert a device into a "destructive device," then the language of subparagraph (3) makes it clear that intention is irrelevant—a combination of parts of such a design is within the statute without regard to the possessor's intent. Thus the parts of a fragmentation grenade constitute a "destructive device" without proof that the possessor intended to assemble the device.

13. Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, which replaced the Federal Firearms Act, excepted from its definition of "destructive device" any "device which is not designed or rede-

with this conclusion.[14] Second, the exception says "designed nor redesigned," and if "design" means "intent," "redesigned" is meaningless. Third, subparagraph (3) uses both words: "designed" or "intended." Fourth, serious Fifth Amendment problems would be created, comparable to those noted below. Finally, it would materially weaken the statute if a possessor of an unregistered grenade, bazooka, or mortar, for example, could defend by asserting that he did not intend to use it as a weapon.

But even if it were concluded, despite these considerations, that the first exception means that an intention *not* to use a device as a weapon *excludes* that device from the Act, this would not support the majority's proposition that an intention to *use* a device as a weapon would *subject* that device to the Act. Otherwise, every weapon—including every sporting rifle and shotgun—that the owner intended to use as such would be within the Act.

As to the second exception, the majority quotes the statutory language: " 'any device, although originally designed for *use* as a weapon, which is *redesigned* for use as a signaling, pyrotechnic, line throwing, safety, or similar device'. (Emphasis added)." And then comments: "Here, appellant's own

admission establishes that the weapon in issue had not been redesigned for any such use."

The majority's meaning is obscure. Here again, however, the suggestion seems to be that "designed" means intended, and that the exclusion of weapons "redesigned" for non-weapon use means that any device that the possessor intends to use as a weapon is within the Act. If this is the majority's meaning, or if the majority is again suggesting that appellant's guilty plea involved an admission that bars his contention that the indictment did not allege an offense, what has already been said in discussing the first exception is equally applicable here.

Finally, as the government points out (note 13), substantial self-incrimination problems would be raised if a maker (or transferor) of a device were required to admit that he intended to use it destructively—as, of course, he would be if his device became a "destructive device" subject to the statute only if he possessed that intent. Persons required to register a present intention to commit a criminal act would seem to face "substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *Marchetti v. United States*, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968).

signed *or used or intended* for use as a weapon" (emphasis added). Title I of the Gun Control Act of 1968 amended that definition to except "any device which is neither designed nor redesigned for use as a weapon." Title II of the Gun Control Act, with which we are here concerned, used exactly the same language. Thus, Congress specifically deleted the exception for a device "not * * * intended for use as a weapon."

14. The government states:
"It is evident that the purpose of the deletion was to avoid self-incrimination problems of the kind [found] in *Haynes* [Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968)]. Thus, if a maker of a device applying to register it was required to admit that the device was intended for a destructive use, he might well have been required to incriminate himself in order

to comply with the registration provisions. Under the present language, possible self-incrimination problems have been avoided by focusing on the design of the device, no matter what the actual intent of the registrant might be. When a defendant now raises the affirmative defense that the device he unlawfully possessed or transferred was not designed or redesigned for use as a weapon, the government need only disprove that allegation without having to establish the defendant's own intended use" (Appellee's Brief at 11–12).

In the government's view, then, "appellant's compliance with the Act would only have indicated that he intended the device * * * to be designed or redesigned for use as a weapon. It would not have indicated that he in fact ever intended to use the device in such a manner." *Id.* at 13–14.

In this case appellant was charged in Count II with transferring the dynamite, fuse, and caps without registering the transfer, as required by section 5812(a). These commercial blasting materials were not subject to the Act unless they were made so by appellant's intention that they be used to destroy property. Persons required to register only if and when they have such an intention would seem to constitute "persons 'inherently suspect of criminal activities.'" Haynes v. United States, 390 U.S. 85, 96, 88 S.Ct. 722, 730, 19 L.Ed.2d 923 (1968). Hence, "it can scarcely be said that the risks of criminal prosecution confronted by prospective registrants are 'remote possibilities out of the ordinary course of law.'" *Id.* at 97, 88 S.Ct. at 730.

\* \* \*

At the minimum, the National Firearms Act did not apply to appellant's alleged conduct with the clarity required of a penal statute.