(5) THE INTERESTS OF IMPARTIAL JUSTICE DEMANDED A NEW TRIAL

■ Only this ground and that part of the fourth ground noting counsel's "impassioned references to matters dehors the record" remain to support the court's order. This ground, however, must fail for lack of specificity. See id. at 277. Neither the order nor defendant's memorandum attached to its motion detail record support for the court's conclusion that a new trial was mandated in the interest of "impartial justice." Specificity is suggested in defendant's memorandum for the court's observation that plaintiff's counsel prejudiced defendant's case by referring to matters dehors the record. But, even if the acts and comments ascribed to plaintiff's counsel occurred as described, we are still left unconvinced that his conduct was so egregious as to justify a new trial. Indeed, on this record counsel's conduct appears singularly restrained.

## CONCLUSION

The grounds relied upon by the district court, whether considered separately or cumulatively, fail to support its order granting defendant's motion for a new trial.

The district court order of September 11, 1969, to the extent that it granted a new trial, will be vacated and the $50,000 verdict resulting from the first trial will be reinstated and judgment in favor of the plaintiff will be entered thereon as of the date of the jury verdict, April 17, 1969.

The judgment of the district court filed March 27, 1971, on the verdict entered in the second trial, will also be vacated.

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Walter POSNJAK, Defendant-Appellant.**

**No. 370, Docket 71-1693.**

United States Court of Appeals, Second Circuit.

Argued Dec. 14, 1971.

Decided March 24, 1972.

Donald M. Kresge, New York City, for defendant-appellant.

Richard J. Arcara, Asst. U. S. Atty. (H. Kenneth Schroeder, Jr., U. S. Atty., for the W. D. N. Y., John F. Kane, Atty., Dept. of Justice, Washington, D. C., of counsel), for plaintiff-appellee.

Before SMITH, KAUFMAN and MULLIGAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This case entails analysis of the definition of a "destructive device" in the National Firearms Act, 26 U.S.C. § 5801 *et seq.* and the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.*, federal statutes intended to regulate the importation, possession, and transfer of weapons, particularly guns, and to stem the traffic in certain unusually dangerous weapons, including "destructive devices," for which Congress saw no legitimate uses. The statutes, although considered and approved in response to a national problem of serious dimensions, about which emotions run high, are highly technical enactments. In construing them, we have been careful to confine ourselves to the law as written. We do not find ourselves empowered to permit what we are told "must" have been Congressional intent to overcome clear statutory language and authoritative legislative history. We conclude

that the sale by Walter Posnjak and his co-defendant of 4100 sticks of 40% nitroglycerine dynamite, with unattached fuse and caps, to a federal agent who told them that he intended to resell the dynamite to a Cuban revolutionary group for use in the destruction of buildings and life, although indicative of a brutal indifference to the anticipated devastating consequences of the sale, is not proscribed by the provisions under which the two nineteen-year-old sellers were indicted and convicted. The acts for which appellant was convicted are not within the prohibitions of the National Firearms or Gun Control Acts in effect at the time of the sale. (The subject has been covered by subsequent legislation specifically directed to the question.)

The defendants were tried before Judge John T. Curtin of the United States District Court for the Western District of New York and a jury and were found guilty on five counts of violation of the firearms statutes: one count of engaging in the business of dealing in firearms when not licensed to do so, in violation of 18 U.S.C. § 922 (a) (1); two counts of possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d); one count of transfer of firearms without payment of a transfer tax, in violation of 26 U.S.C. § 5861 (e); and one count of conspiracy to violate section 5861(e), in violation of 18 U.S.C. §§ 2, 371. Posnjak was sentenced to the custody of the Attorney General under 18 U.S.C. § 5010(b), as a youth offender. We find error in the interpretation of the Acts and reverse the conviction.

The facts are as follows. In late 1969, Posnjak and his co-defendant became acquainted with Michael Levine, an undercover agent of the Alcohol, Tobacco, and Firearms Division of the Department of the Treasury, who was investigating possession of weapons by subversive groups, particularly motorcycle gangs, in upstate New York. Apparently on a third party's suggestion, Posnjak contacted Levine and asked what he was seeking. Hearing it was weapons, he asked Leyine whether he was interested in dynamite, which Posnjak, having worked for a fireworks display outfit, had a license to buy and transport in New York. See N.Y. Labor Law, McKinney's Consol.Laws c. 31, § 458 (1949), as amended N.Y.Sess.Laws 1970, c. 1022. Levine indicated his interest; he confided that he was procuring for a Cuban revolutionary group that intended to blow up buildings and people, and suggested that he take 100 sticks for approval by the group. Several days later the agent reported that the group was pleased with the first batch and he placed an order for 4000 sticks, informing Posnjak once again of the fictitious group's dark schemes. Posnjak and his co-defendant were arrested as they were delivering the dynamite, fuse and caps to the agent. The explosives were not registered in the National Firearms Registration and Transfer Record pursuant to the provisions of the National Firearms Act, 26 U.S.C. § 5841 (Supp. IV 1968).

The government contended at trial that although commercial dynamite was not per se covered by the statutes, it would be susceptible to statutory regulation when the transferor intended or knew that the transferee intended to use it "as a destructive device."[1] The court

---

[1]. Raymond Lesage, a Criminal Investigator Coordinator in the Firearms Section of the Alcohol, Tobacco and Firearms Division of the Treasury Department, testified that most transfers of dynamite are not registered; he had heard of only one case other than the present one in which dynamite was a destructive device. In response to attempts by defense counsel to ascertain what made a stick of dynamite into a "destructive device," he said: "Well, if a farmer buys a stick of dynamite and uses it to blow up a tree stump, it is certainly not a destructive device then, but on the other hand, if he blows up somebody's car, that is a destructive device." The test is "how it is used, how it is proposed to be used, intended to be [used]." The record is unclear as to

instructed the jury that "the important thing is what is the intent, the purpose, the design of the defendant or defendants in this case." If they intended that it be used "in some fashion or manner as a bomb, grenade or other explosive" then it fell under the statutory definition of destructive device.[2] If they thought it would have a legitimate commercial use or didn't know what the dynamite was to be used for, then it was not covered. The defendants contended that the statute did not cover commercial dynamite, regardless of the intent of the transferor; that the statute was, in any case, vague; and that they were entrapped by the agent. The jury found them guilty on all counts. On appeal, Posnjak continues to urge that the statute does not apply to commercial dynamite and that he was entrapped as a matter of law; he also claims that the court in his charge to the jury misread the statutes in a prejudicial way. We agree with the first contention and reverse the conviction on that basis.

The statutory provisions under which appellant was convicted were enacted in 1968, as part of a Congressional attempt to stem the traffic in dangerous weapons being used in an increasing number of crimes involving personal injury. In June of that year, Congress passed, as Title IV of the Omnibus Crime Control and Safe Streets Act, Pub.L. No. 90–351, 82 Stat. 197, amendments to the criminal provisions on firearms, 18 U.S.C. § 921 *et seq.*, to regulate the transfer and sale of firearms by licensed dealers to persons thought likely to misuse them. These provisions were deemed unsatisfactory to accomplish their purpose, however, and later in 1968 the Gun Control Act was passed, Pub.L. No. 90–618, 82 Stat. 1213, further

amending Title 18 and revising the National Firearms Act, 26 U.S.C. § 5801 *et seq.*, which dealt with registration and taxation of certain highly dangerous weapons, such as machine guns. "Destructive devices," included in the definition of "firearms" for the first time in the Crime Control Act, were somewhat redefined and were included in the provisions of both titles.

The Title 18 provisions create a broad regulatory scheme; they cover "(A) any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; (D) any destructive device." 18 U.S.C. § 921(a) (3) (Supp. IV 1968). The Act prohibits the importation and shipping in interstate commerce of firearms by persons other than licensed dealers, importers and manufacturers except in certain limited circumstances; prohibits sale by licensed dealers to those under 18, or in some instances 21 years of age, and to other specified groups felt incapable of handling weapons wisely; prohibits sale to residents of states other than the dealer's own; sets rules for the non-face-to-face sale of firearms by licensed persons; prohibits the transportation and sale of a destructive device, machine-gun, or short-barreled shotgun or rifle by anyone not licensed; and regulates the shipping of firearms or ammunition by common carrier. 18 U.S.C. § 922 (Supp. IV 1968).

The National Firearms Act provisions focus on the particularly dangerous weapons subject to special rules under the Gun Control Act, and set rigorous registration and taxation requirements for the dealers and transferors of those weapons.[3] Importers, manufacturers,

---

whether Mr. Lesage felt it became a destructive device only when it was going to be used illegally or whether it became such when it was going to be employed in an anti-social fashion (assuming the latter category is somewhat broader than the former). Once it is going to

be used "as a destructive device," it must be registered and a tax paid.

2. For the definition of "destructive device," see p. 2343 *infra*.

3. "Firearm" under this Act includes "(1) a shotgun having a barrel or barrels of

and dealers in the firearms covered must register and pay an occupational fee. Sections 5801, 5802. A $200 tax is assessed on each firearm made (section 5821) and on each transfer of the firearm. Section 5811. Approval for manufacture must be obtained from the Secretary. Section 5822. Reporting and record keeping are mandatory, as is the presence of approved identification on the weapon. The transferor of a firearm must register the transaction, submitting identification of himself, the firearm, and the transferee (including fingerprints and a photograph of the latter) and approval by the Secretary or his delegate (usually a local law enforcement officer) of the transfer. Section 5812; 26 C.F.R. § 179.9. Violation of either act can result in lengthy prison sentences and heavy fines. 18 U.S.C. § 924; 26 U.S.C. § 5871 (Supp. IV 1968).

As noted above, the two acts cover different weapons, accessories and components in their definitions of "firearms," but both include as firearms "destructive devices," and the definition of such devices is identical in the two statutes. A destructive device is:

(1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordinance sold, loaned, or given by the Secretary of the Army . . .; or any other device which the Secretary of the Treasury or his delegate finds is not likely to be used

less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) a muffler or a silencer for any firearm whether or not such firearm is included within this definition; and (8) a destructive device. The term 'firearm' shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary or his delegate finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon." 26 U.S.C. § 5845(a) (Supp. IV 1968). "Any other weapon" means "any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made or intended to be fired from the shoulder and not capable of firing fixed ammunition." 26 U.S.C. § 5845(e) (Supp. IV 1968).

as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes. [26 U.S.C. § 5845(f) (Supp. IV 1968)] [4]

Congressional concern, when it passed these statutes, was to halt the growing number of crimes in which guns were used to inflict or threaten bodily harm. Congress found it a matter of national concern to make firearms less readily available to juveniles, criminals, addicts, mental defectives, armed groups who would supplant public authorities, and others considered likely to put them to illegitimate uses. S.Rep.No.1501, 90th Cong., 2d Sess. 22 (1968). The weapons primarily aimed at were guns, especially cheap handguns being imported from abroad, surplus military weapons, unfit for sporting purposes, being dumped in this country, and rifles and shotguns, "the chosen weapons of the sniper." S. Rep.No.1501, *supra*, at 24; 114 Cong. Rec. 26716–17 (1968) (remarks of Senator Dodd). The category of "destructive devices" was intended to cover the military-type weapons—mines, grenades, bombs, and large-caliber weapons, such as bazookas, mortars, and anti-tank guns. S.Rep.No.1501, *supra*, at 25, 30; 114 Cong.Rec. 26898, 26900, 27133 (1968). To the other group of weapons regulated by the National Firearms Act, "gangster-type weapons," which before revision meant mainly machine-guns, Congress added short-barreled shotguns and short-barreled rifles, declaring that such weapons have no appropriate sport-

ing or other lawful use. S.Rep.No.1501, *supra*, at 28; 114 Cong.Rec. 26896 (1968) (remarks of Senator Hruska).[5]

The extensive legislative history confirms the fact that certain types of guns were the weapons Congress was most concerned to reach.[6] Nowhere was commercial dynamite mentioned as a destructive device or target of the legislation. In fact, during a discussion on the definition of "destructive device," the following exchange took place between Senator Metcalf of Montana and Senator Dodd, a proponent of the bill and a member of the Judiciary Committee:

Mr. Metcalf: . . . The Senator has included explosive devices under the destructive portions of the act.

Mr. Dodd: Yes.

Mr. Metcalf: Does that mean that dynamite for mines or construction companies, and so forth, is included?

Mr. Dodd: No, it does not, Senator. What I had in mind was things like hand grenades and other types of mines and bombs.

Mr. Metcalf: Antipersonnel mines.

Mr. Dodd: Yes.

Mr. Metcalf: So that a legitimate prospector—

Mr. Dodd: He is not included under the provisions at all.

Mr. Metcalf: He could get dynamite.

Mr. Dodd: This provision has nothing to do with that type of business.

---

4. In Title 18, the subparagraphs are lettered (A), (B), etc., while in Title 26 they are numbered; the subdivisions below those headings are likewise identified in different ways. The numbering used in Title 26 will be used throughout, although the intent, unless specifically stated to be otherwise, is to refer to both versions of the definition.

5. For the history of Congressional concern with such weapons, *see*, e. g., Hearings on Proposed Amendments to Firearms Acts before the House Committee on Ways and Means, 89th Cong., 1st Sess. 3–4, 29, 34, 35, 48–50 (1965); Hearings on the Federal Firearms Act before the Subcommittee to Investigate

Juvenile Delinquency of the Senate Committee on the Judiciary, 90th Cong., 1st Sess. 51–52, 54, 1087, 1090 (1967).

6. The concern with guns was reasonable in light of the fact that in 1968 8,105 of 12,508 murder victims were killed with the use of guns. Six were murdered by means of explosives. 1968 FBI Uniform Crime Reports 108. For Congressional discussion of this and other issues raised by the Act, *see* S.Rep. No.1501, *supra*; H.R.Rep.No.1577, 90th Cong., 2d Sess. (1968); Conf.Rep.No. 1956, 90th Cong., 2d Sess. (1968); S. Rep.No.1097, 90th Cong., 2d Sess. (1968); 114 Cong.Rec. 26715ff., 26808ff., 26900ff., 27110, 27141ff., 27402–492.

It specifically excludes such *items* which would be used in commercial construction or business activities.

(emphasis added) [114 Cong.Rec. 12448 (1968)] [7]

The legislative history suggests strongly, then, that Congress was concerned in the National Firearms Act mainly with clearly identifiable weapons which were the cause of increasing violent crime and which had no lawful uses, and that the intent of the user of these weapons was irrelevant, as they were so prone to abuse that they were considered *per se* dangerous and unnecessary for legitimate pursuits. Congress did not mention or deal with possible unlawful uses of otherwise legitimate devices, but concentrated on objectively identifiable weapons of war and "gangster-type weapons."

■ When we turn to the specific statutory language at issue on this appeal, we conclude that it supports the contention that commercial blasting dynamite is not covered by the Acts. Subparagraph (1) of the definition lists several specific military-type devices— explosive, poison gas or incendiary bombs, grenades, rockets, mines—and "similar devices." The last phrase must logically be taken to mean devices similar to the preceding enumerated items in that they are articles of military ordnance, not merely that they (in addition to innumerable other articles) are products with some explosive power. *See* S.Rep.No.1501, *supra*, at 47.

■ Nor does commercial dynamite come within subparagraph (2), for it is not and cannot readily be converted into a weapon which will expel a projectile and which has a barrel with a bore of more than one-half inch in diameter.

The third subsection of the definition is the one within which the government claims the dynamite is encompassed. That section includes any combination of parts designed or intended for use in converting any device into a destructive device as defined in the earlier two subparagraphs and from which such a device may be readily assembled. Thus, the components or parts of a device are subject to the law if the assembled device would be. The third section does not broaden the group of devices which are covered; it merely precludes evasion through possession of the unassembled components instead of the assembled item. All of the necessary components "from which a destructive device may be readily assembled" must be possessed in order to possess a "destructive device" under subparagraph (3).

■ The definition contains several exceptions; nothing neither "designed nor redesigned for use as a weapon" is included. The legislative history indicates that "designed" in this context refers to objective, physical structure or method of operation and not to intent or schemes of the possessor. *See* H.R.Rep. No.1577, *supra*, at 10, 22; Conf.Rep.No. 1956, *supra*, at 27–28; p. 3758 *infra.* Otherwise, the use of "redesigned" would be meaningless. The Committee Report stated that this exception was an affirmative defense; a device which otherwise appeared to fall within the statute would be exempted from its requirements if it could be shown that it was not designed as a weapon. S.Rep.No.1501, *supra*, at 47. The converse, of course, is not necessarily true; a device designed as a weapon does not fall within the Act unless it fits within one of the categories of the definition.

The application of these principles and words to the present case indicates clearly that the dynamite, with fuse and caps, does not fall within the definition. Were these components fitted together,

7. This discussion took place during consideration of the Crime Control Act, in which "destructive devices" were first introduced. The definition was changed in the later legislation to include the components of the specific devices mentioned in the earlier definition, and to provide for certain exceptions to the definition. The assembled devices defined as "destructive devices" remained the same, however.

they would produce a stick of commercial or industrial dynamite ready for use in blasting, but they would not yield a device named in one of the first two subparagraphs of the definition. While dynamite might be the explosive material in a device which would fit under the definition, components which the appellant did not have would be necessary accompaniments in order to construct any such device.

The government agreed that commercial dynamite *per se* was not covered by the Act and that commercial dynamite manufacturers were not expected to and in fact had not registered under the statutes as makers of destructive devices. The government position was that when dynamite is intended for use "as a destructive device," it does incur statutory liabilities. This conclusory and rather opaque statement seems to incorporate or refer to two somewhat distinct arguments about the coverage of the statute; neither is persuasive or correct in its reading of the statutory language.

One possible argument is that the components of any device that can be used in a destructive fashion are within the definition. Under this theory, every manufacturer and seller of commercial dynamite would have to register it and would fail to do so only in reliance on his ability, once arrested and prosecuted, to show that it was not "designed" for use as a weapon. Such an interpretation of the statute, particularly as "designed" is used in an objective and not a subjective sense, is clearly incongruous with Congressional intent. As initially drafted, subparagraph (3) covered "any combination of parts . . . for use in converting any device into a destructive device." *See* S. 1854, 90th Cong., 1st Sess. (1967). The General Counsel of the Treasury noted that this did not completely define "destructive device" in this context. At his suggestion, the phrase "as defined in subparagraphs (1) and (2)" was added to clarify the wording. Hearings on the Federal Firearms Act before the Subcommittee to Investigate Juvenile Delinquency, *supra* n. 5 at 1087, 1089. *See also* S.Rep.No.1501 at 45–46. This makes it clear that only those combinations which produce a device specified under (1) or (2) are referred to in (3).

The other interpretation, espoused by the district court in this case, is that a device can be transformed into a "destructive device" through intent; if the transferor intends that it be used as a weapon or knows that the transferee will use the device in an unlawful manner, the device falls under the statute. This is so even though the device would not normally fall within the statutory ambit. In fact, the device would have to be one which did not otherwise fall under the Act, for in that case it would have to be registered no matter what the subjective intent of the possessor or transferee. This was the interpretation of the statute adopted by the majority in United States v. Oba, 448 F.2d 892 (9th Cir. 1971), cert. denied, 404 U.S. 954, 92 S.Ct. 329, 30 L.Ed.2d 2071 (1972) in which the defendant was convicted under the National Firearms Act for unlawfully possessing a destructive device, seven sticks of dynamite wrapped in copper wire and equipped with fuse and caps.

For several reasons we conclude with the dissenting judge in *Oba* that this interpretation is based on an erroneous reading of the statute. It attempts, as does the interpretation just discussed, to import under subparagraph (3) devices not specifically identified in the first two subparagraphs. This is clearly impermissible; Congress made no mention of devices made criminal because of the intent of the possessor or transferee. In fact the exception about objects "neither designed nor redesigned for use as a weapon" was pared from an earlier version which excluded items "neither designed nor redesigned nor used nor intended for use as a weapon"; a defendant would have been able to show as an affirmative defense that a device which fell under the statute was not "intended for use" as a weapon.

*See* H.R.Rep.No.1577, *supra*, 10, 22; Conf.Rep.No.1956, *supra*, at 27–28. The Conference adopted the narrower Senate version, indicating that the standard was to be an objective one, not dependent on the "intent" or schemes of the possessor.[8]

■ In light of this Congressional intent and the lack of language in the statute to justify engrafting a new group of weapons onto the statute, it would be anomalous so to construe the law. " 'The National Firearms Act is drafted in technical language . . .' United States v. Collier, C.A. 6th (1967), 381 F.2d 616, 618, 619 [5, 6]. It must be construed, therefore, technically." United States v. Lamb, 294 F.Supp. 419 (E.D.Tenn.1968). And it is a well-established principle that criminal statutes are to be narrowly rather than expansively construed, in order to avoid subjecting to prosecution any activities and individuals the legislature did not mean to expose to liability.[9]

A rule that registration of materials such as commercial dynamite is obligatory only when the transferee intends to use it illegally or improperly would present acute problems of self-incrimination. As the government explained in United States v. Oba, *supra*, "if a maker of a device applying to register it was required to admit that the device was intended for a destructive use, he might well have been required to incriminate himself in order to comply with the registration provisions. Under the present language, possible self-incrimination

problems have been avoided by focusing on the design of the device, no matter what the actual intent of the registrant might be." Appellee's brief at 11–12, United States v. Oba. In other words, if dynamite only had to be registered by makers or possessors with a present intention to use it unlawfully or to sell it to one who would use it in that manner, those individuals would be faced with "substantial . . . hazards of incrimination." Marchetti v. United States, 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). This would arise from the necessity of obtaining the Secretary's approval before making or transferring a firearm. He denies the application if "making or possession of the firearm would place the person making the firearm in violation of law;" (26 U.S.C. § 5822) so an application would not inform him of the fact of illegal making or transferring, but it would entail admission of an intent to transfer it to one who planned to use it unlawfully. This could expose an individual to charges of conspiracy and possibly more, and might make the registration requirement for such dynamite unconstitutional. This is not the case as to all other destructive devices, which fall under the statute because of their objective physical nature. In those instances, the requirement of applying before making or transferring does not necessarily involve the admission of illegal schemes as it would with the dynamite. *See* United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971).

8. Even had this clause remained, making it possible to show that a weapon was not included in the statute because of the non-destructive intent of the possessor, that would not necessarily mean that weapons could be included solely on that basis. The exclusion of intent as a method of exempting weapons otherwise covered is merely indicative of a general desire to rely on objective rather than subjective standards.

9. United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). *See* 3 Sutherland, Statutory Construction (3d Ed. F. Horack 1943), Ch. 56, §§

5604–06, at 44–67; Yu Cong Eng v. Trinidad, 271 U.S. 500, 515–523, 46 S.Ct. 619, 70 L.Ed. 1059 (1926). Judicial "revision" or "expansion" of criminal statutes may lead to problems of vagueness under the due process clause, for the statute on its face may not adequately warn individuals of what is proscribed. *See* Johnson v. United States, 410 F.2d 38 (8th Cir.), cert. denied, 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 72 (1969). *See also* Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948); United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921).

Our conclusion was concisely stated by Judge Dooling in United States v. Schofer, 310 F.Supp. 1292 (E.D.N.Y. 1969), dismissing an indictment under the National Firearms Act and holding that dynamite, caps, and lengths of fuse did not constitute a "firearm" under the statute:

The statute's terms indicate that it was not intended to reach such ordinary commercial materials through "intent" alone. The language implies at minimum the presence of parts "intended" to "convert" any "device" into a destructive device akin to those referred to in § 5845(f) (1) and (2), all of which have definite non-industrial characters. The articles here could be assembled only into the familiar industrial blasting charge; the risk of anti-social use here was not inherent in the articles or in any suitability they had for "conversion" to a non-industrial weapon or "mine," but in the potential perversion of their use. The potential is rather that of the parked motor vehicle that can be made a lethal weapon by perversion of its purpose. Since the statute is aimed at the kind of evil articles it describes, and not at evil perversions of the use of articles of innocent commerce without alteration of their nature or mode of operation, it must be concluded that the articles

were not within the statute and that the indictment is ill-founded.

[310 F.Supp. at 1297–1298]

One source of confusion which possibly misled the trial court in this case is the use of "intended" in the phrase in subparagraph (3), "any combination of parts designed or intended for use in converting any device into a destructive device. . . ." It appears that in some instances this intention to convert a device into an article listed in the statute will be relevant. When it is clear that the assembled device created by combining the components falls within (1) or (2), intent is irrelevant, for the parts are clearly "designed" to convert the device into a destructive device. When it is equally clear that the end product does not fall within one of those categories, the same is true. When, however, the components are capable of conversion into both such a device and another object not covered by the statute, intention to convert the components into the "destructive device" may be important. In United States v. Davis, 313 F.Supp. 710 (D.Conn.1970) in which the defendant was found with bottles, rags, and a can of gasoline, the question of whether he intended to convert these components into a Molotov cocktail, a crude but well-known variety of incendiary bomb, was a central issue.[10]

---

10. In that case, Davis admitted that he intended to construct a Molotov cocktail and bomb a factory in New Haven, Connecticut. Statutory coverage in that situation may therefore give us few qualms. However, given the emphasis throughout the legislation on physical and objective determinants of coverage, we feel impelled to urge that this provision, allowing a reliance on an examination of intent to determine whether a destructive device was to be created and therefore whether the components are within the statute, be narrowly construed; we cannot think of many instances in which circumstantial evidence would be persuasive on that point. This is particularly true in cases such as *Davis* in which the defendant had done nothing to com-

bine the parts into the destructive device. Although the court there denied it, it is possible under the construction of "combination" it espoused, i. e., a physical collection of items, that an individual might well have constructive possession of the parts of a bomb in his kitchen, workshop or garage; and he would have done no less than Davis to actually construct the bomb. We would therefore urge that when intent is a factor, "combination" be strictly construed (or its dictionary definition closely followed) to require the presence of some union, mixing or physical joining of the elements so that they lose their independent nature before they are held to be a destructive device under the statute.

This question of intent is irrelevant in the present case, however, for no combination of the components produces a device as defined in the first two subparagraphs. And it is clear that the intent to "convert" a "device" is not the same as the intent to create a device which will be used improperly for the destruction of property or lives. The latter sort of intent has no relevance to the definition of "destructive device."

Only a small number of cases have considered the susceptibility of commercial dynamite, in certain circumstances, to the provisions of the statute. In United States v. Oba, *supra,* the defendant was found in possession of seven sticks of dynamite wrapped with copper wire and fitted with caps and fuse; he admitted that he intended to use the device as a bomb to destroy property in the city of Eugene, Oregon. The court found "in light of the nature of this device and its admitted purpose" that it would be "absurd to even question its inclusion within the definition of 'destructive device' approved by Congress." With all respect we submit the court's treatment of the words of subparagraph (3) to arrive at a conclusion of coverage ought not have been necessary; the device had been assembled and was described in the indictment as one object. The provisions of subparagraph (1), if anything, ought to have been relevant.

*Oba* can be distinguished from the present case because Posnjak did not have or sell all the components of a bomb, while Oba's actions had produced a bomb, however crude, and not merely dynamite adaptable to numerous legal purposes. The court there did not rely on this factor, however, and over and above the factual distinction, we agree with the dissenting judge in his conclusion, based on a careful analysis of the statutory language and legislative history, that a device which as an objective matter does not fall under the specific categories in the definition is not brought within their coverage by the owner's intent.[11]

Our conclusion here may appear contrary to some of the broad language in the legislative history to the effect that Congress intended to proscribe the activities generally associated with armed groups devoted to disruption of public authority, but it is apparent that concern for commercial dynamite manufacturers and users or other reasons led that body to stop short of regulation of transactions such as that arranged by Posnjak and Levine. But such activity need not go untouched by the law merely because these provisions do not reach it. New York state passed a comprehensive law in the spring of 1971, regulating the sale and distribution of explosives and the criminal use of incendiary and explosive devices. N.Y.Sess.Laws 1970, c. 1022, amending N.Y. Penal Law, McKinney's Consol.Laws c. 40, §§ 265.05, 265.15 and N.Y. Labor Law §§ 450–464–a. The bill revamped the procedures for obtaining a license to purchase and use explosives; authority was centralized in the State Industrial Commissioner, who is authorized to set standards and to investigate thoroughly all persons applying for such licenses. N.Y. Labor Law § 458. The penal provisions were amended to prohibit possession of "any explosive or incendiary bomb, bombshell, firearm silencer, machine-gun or any other firearm or weapon simulating a machine-gun . . ." and of certain dangerous instruments, such as a switchblade knife, cane sword, blackjack, or metal knuckles. N.Y. Penal Law § 265.05(1), (3). The penalty for possessing "any explosive substance with intent to use the same unlawfully against the person or property of an-

---

11. United States v. Schofer, *supra,* another case on dynamite, held that 38 sticks of dynamite and a reel of safety fuse (both found in the home of a female friend of the defendant) and blasting caps (found in a metal box under a seat in the defendant's car) were not a destructive device under the National Firearms Act because when combined they did not produce a military-type weapon. See pp. 2352, 2353.

other" was substantially increased.[12] The transaction alleged in the indictment took place before this law went into effect, but even at that time, possession of any explosive substance with intent to use it unlawfully was a class D felony under New York law. Penal Law § 265.05 as amended by N.Y.Sess. Laws 1970, c. 1022.

Similarly, Congress in 1970 passed new and stringent legislation on the importation, manufacture, distribution, and storage of explosive materials. Pub.L.No.91–452, 84 Stat. 952 (Oct. 15, 1970), 18 U.S.C. § 841 *et seq.* "Explosives" are defined as "any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion; the term includes, but is not limited to, dynamite and other high explosives. . . ." 18 U.S.C. § 841(d) (Supp.1970). Procedures for licensing and record keeping are set forth in detail. 18 U.S.C. § 843 (Supp.1970). It is unlawful to transport or receive or attempt to "transport or receive, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property." 18 U.S.C. § 844(d).[13]

The enactment of this statute would seem to indicate an awareness by Congress that earlier legislation did not cover the materials defined as explosives; it supports the contention that the Gun Control Act did not adequately regulate, or touch at all, the activities proscribed by the explosives act. And it must be remembered that had Agent Levine really been involved in a plot to bomb buildings, Posnjak could have been prosecuted as a participant in a conspiracy or as an accomplice in the crime.

Our resolution of the issue of the statute's scope removes the need to consider the issues of entrapment and the court's charge to the jury. We do note, however, that the court several times, in listing the devices in subparagraph (1) of the "destructive device" definition, erroneously inserted commas after the adjectives so that it read as though it covered an "explosive, bomb, mine, grenade, etc." This made "explosive" into a noun and expanded the definition beyond its intended reach.

We reverse the judgment and order the indictment dismissed.

---

12. For the legislative history and some explanation of the new provisions, see Penal Law § 265.05, Supplementary Practice Commentary (1970).

13. The definition of "explosives" for the purposes of this and a few other criminal acts is broader than the definition above, applicable to the other provisions of the law, and includes "gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, . . . and any chemical compound, mechanical mixture, or device that contains any oxidizing and combustible units . . . in such proportions . . . that ignition by fire, by friction, by concussion, by percussion, or by detonation . . . may cause an explosion." 18 U.S.C. § 844(j) (Supp. 1970).