**UNITED STATES of America**

v.

**Greg H. RUSSELL.**

**Crim. No. B–78–542.**

United States District Court,
S. D. Texas,
Brownsville Division.

March 24, 1979.

Johnson & Davis, William C. Rountree, III, Harlingen, Tex., for defendant.

## MEMORANDUM AND ORDER

GARZA, Chief Judge.

On October 10, 1978, a Grand Jury delivered a three-count indictment against the Defendant Greg H. Russell. Count 1 charges that the Defendant had knowingly and unlawfully possessed a firearm, more specifically a destructive device, which was not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d). Count 2 alleges that the Defendant had knowingly and unlawfully possessed a destructive device which was not identified by serial number as required by 26 U.S.C. § 5861(i). The third count charges that the Defendant knowingly and unlawfully transferred the destructive device, failed to pay the transfer tax as required by 26 U.S.C. § 5811 and failed to file a written application form with the Secretary of the Treasury for the transfer and registration of the firearm to the transferee as required by 26 U.S.C. § 5812, all in violation of 26 U.S.C. § 5861(e). The Defendant, accompanied by his court-appointed counsel, appeared before United States Magistrate William M. Mallet on October 20, 1978 and entered a plea of not guilty. Shortly thereafter, the Defendant filed a Motion to Dismiss accompanied by a Supporting Memorandum.[1] This Motion to Dismiss was subsequently answered by the Government in a Memorandum of Law. The Defendant Russell appeared before the Court on January 15,

J. A. "Tony" Canales, U. S. Atty., Houston, Tex., and Charles Lewis, Asst. U. S. Atty., Brownsville, Tex., for the Government.

---

1. The Defendant filed a Motion to Suppress Evidence on November 6, 1978, the same date that he filed his Motion to Dismiss. The Defendant sought to suppress all evidence of written statements made by him to agents of the federal government because they were allegedly obtained in violation of his privilege against self-incrimination and his right to the assistance of counsel. The Defendant also asserted that his arrest was unlawful and that any statements subsequently made by Defendant should be suppressed. The Defendant at trial, however, did not reassert nor argue his Motion to Suppress at the trial. The Defendant's oral argument stemmed entirely from his Motion to Dismiss. Even assuming that the Defendant still desires to assert his Motion to Suppress, this Court is of the opinion that it is wholly without merit. Testimony at trial demonstrates that the arrest was lawful and that the Defendant was sufficiently made aware of his constitutional rights. It is also clear that the Defendant understood his rights and all answers made by him were freely given and intelligible.

1979, for final pre-trial. He waived his right to a jury trial, and a trial before the Court was scheduled for March 2, 1979. This trial was then postponed until March 7, 1979. The Defendant appeared for trial on that date. At the trial, the Defendant, through his counsel, presented and argued his Motion to Dismiss which had been carried along with the case. After the presentation of five government witnesses, cross-examination by the Defendant and further oral argument by the attorneys representing the Defendant and the Government, this Court denied the Defendant's Motion to Dismiss. Immediately after this ruling, the Court found the Defendant guilty on all three counts. The Court ordered that a pre-sentence investigation be conducted and that sentencing be imposed on April 5, 1979. The purpose of this Memorandum and Order is to present the findings of fact and conclusions of law.

## I. THE FACTUAL BACKGROUND

The Government presented five witnesses from whose testimony the facts in this Memorandum and Order have been taken. The witnesses included Robert Valadez, James Wheeler and James L. Sudberry, all of whom are Special Agents of the Department of the Treasury, specifically, the Bureau of Alcohol, Tobacco and Firearms [hereinafter the "ATF"]. The fourth witness was Walter Mitchell, an employee of the ATF, who qualified as an expert in explosives and chemical analysis. The final Government witness was Ralph E. Cooper who is Explosive Enforcement Officer within the Explosive Technology Branch of the ATF and was qualified as an expert witness at the trial.

In June, 1978, Agent Valadez, stationed in Oklahoma City, Oklahoma, traveled to the South Texas area to conduct undercover activities in regard to this case. At approximately 6:30 p. m. on June 21, 1978, Agent Valadez followed a confidential informant to a post office parking lot in San Juan, Texas. Valadez remained at the parking lot while the informant departed to find the Defendant. When they returned, Agent

Valadez remained in the driver's seat of his car, the Defendant got into the front passenger's seat, and the informant sat in the back seat. The agent introduced himself as Bob Hernandez. The Defendant then removed a plastic bag containing a brown sticky substance which he said was C–4. C–4 is a white play-doh-like plastic explosive used by the armed services for demolitionary purposes. Like C–4, the brown sticky substance was a moldable material. Agent Valadez remarked that he had worked with C–4 in Vietnam and that the explosive had always been white in color. The Defendant stated that the brown substance was a new type of C–4 being used by the U.S. Navy. Agent Valadez asked if he could have a small piece of the substance for the purpose of a test. At this point, the informant told the other two that he did not want to be present if they were going to test the explosive, and he departed in his own car.

The agent, after pinching off a piece of the "C–4," alighted from the car and touched the sample with the burning end of his cigarette. The substance burned. Agent Valadez then returned to the car whereupon the Defendant told him he could obtain as much "C–4" as Valadez desired. The Defendant said he had a supplier-friend who was in the Navy. The Defendant informed Valadez that he possessed three or three and one-half pounds which were available immediately, but a delivery of fifty pounds or more would require five to seven days. Valadez inquired of the price, and the Defendant told him that he had sold the same type of explosive for $2500 per pound in Reynosa, Mexico. The agent related that such a price was exorbitant and said he would give him $800 for the entire three and one-half pounds. The Defendant asserted that he would suffer a loss of $75 at that price, but he stated that he would accept $1000. Valadez responded that $950 was his top price at which point the Defendant acquiesced.

The Defendant then told Valadez to drive him to a little grocery store across the street so that the former could call a friend

who was keeping the explosives. Valadez obeyed the Defendant's instructions and waited in the car while Russell went into the store. After a minute or two, the informant drove up in front of the store. The Defendant walked out of the store, saw the informant and hollered at him. The Defendant then spoke with the informant and told Valadez that he would return in a few minutes. The Defendant and the informant left together while Valadez returned to the post office parking lot, having retained the "C–4." The informant returned alone in two or three minutes explaining that he had left the Defendant at his house. The Defendant arrived a few minutes later in a 1975 Pontiac. Valadez then sat in the front passenger seat of the Defendant's car. The Defendant handed him a brown paper sack containing five half-pound plastic bags. Inside those plastic bags was the same type of substance as found in the first bag. Realizing the total amounted to only three pounds, Valadez inquired about the other half pound to which the Defendant had earlier referred. Russell informed him that his "buddy" had sold it.

Valadez then took the paper sack and placed it in the trunk of his car. Realizing that he had received no blasting caps, Valadez inquired about them. Russell told him that he had forgotten to bring them and returned to his house. Five minutes later, the Defendant returned with an electric blasting cap equipped with a length of legwire. Valadez then asked Russell how to use the "C–4." Russell told him to mold the substance around the blasting cap. Russell explained that Valadez' next step would be to attach the legwire to a car battery or any other object which Valadez desired to demolish.[2] Russell stated that he had once dynamited a house in Reynosa using only a quarter pound of the substance. Valadez then said the he wanted his people to examine the substance and would report back to Russell. Valadez did contact Russell at a later time informing the latter that the substance did not perform as well as the C–4 Valadez had used in Vietnam. Valadez then asked if Russell possessed anymore of his "C–4." The Defendant said that ten pounds were available in the area, but someone else had it at that time. Valadez told him that he would need a larger quantity in order to make his drive from Oklahoma worthwhile. Russell told him that quantity was no problem. The Plaintiff and the Defendant then agreed that the latter would in the future supply one blasting cap for each pound of "C–4."

After this meeting, at about 7:30 on the same evening, the six plastic bags and the blasting cap were delivered to Agent James Wheeler in the Hilton parking lot in McAllen, Texas. Photographs were taken of all the items on the following day. Although the materials could have been transported to Corpus Christi for storage, Agent Wheeler was concerned with the safety of such an excursion. The odor of nitroglycerin was very strong, and the temperature outside was 100°. Because of these factors, the ATF agents telephoned Ralph Cooper in Washington, D.C. and relayed their anxieties about the explosive to him. Cooper was unsure of the type of explosive possessed by the agents, but he was aware that if the substance was dynamite, it would possess the capability of exploding under such circumstances. In light of this, Cooper advised that they destroy the explosive and the blasting cap. Following standard procedures, the explosive and blasting cap

---

2. Desiring to demonstrate the effect that three pounds of dynamite would have upon a vehicle, the ATF obtained dynamite and a blasting cap which were substantially identical to the materials sold by the Defendant. Ralph Cooper then conducted a test upon an abandoned car. The car, although not functional, still possessed all its major parts such as an engine, windshield, tires and interior. The explosive charge was positioned in the rear of the engine area. Normally, to prime such a device, one wire would be attached to the battery and another to the spark plug vicinity. For obvious reasons of safety, however, the device was connected to a wire which allowed it to be detonated from a safe distance. Government Exhibit 8, a film of this experiment, was introduced and viewed at trial. Upon detonation, the dynamite completely destroyed the engine and front seat areas of the vehicle and caused substantial damage to the remainder of the car.

were burned in the presence of Agent Wheeler. The agents preserved enough of the substance to allow an analysis. This residue was sent to the ATF laboratory in Atlanta, Georgia. At that lab it was determined that the substance was in actuality commercial-type dynamite and not C–4.

On October 11, 1978, Agents Wheeler, Sudberry, Rodriguez and Viera arrested the Defendant at his home in San Juan. The Defendant was advised of his constitutional rights at that time. Testimony from both Agents Wheeler and Sudberry attest to the fact that the Defendant understood what the agents had told him, appeared clear headed and responded in an intelligible manner. After being advised of his rights, the Defendant told the agents that a friend of his and a third person, whom the Defendant thought was in the Navy and stationed in Tennessee, had brought the explosives to his house so that he could set up a trade for a quantity of marijuana. After a period of time, the Defendant informed them that he was unable to arrange the requested trade. Afterward, the Defendant's friend gave the man from Tennessee four or five pounds of marijuana with the understanding that the explosives would remain at the Defendant's house until sold. At the time of the arrest no additional explosive material or blasting caps were found. Additionally, although Agent Sudberry thought that the Defendant may have exhibited some symptoms characteristic of a heroin addict, no evidence was ever presented to prove such fact.

At the trial, the Court was presented with a certificate from the ATF that the explosives sold by the Defendant were not registered or lawfully acquired by him. It also certified that the Defendant had made no application to make or transfer the explosives nor that he had paid the making or transfer tax on the explosives. Additionally, Agent Wheeler stated that the explosives had possessed no ATF serial numbers as required by law. Finally, it was elicited at trial that the components sold to Valadez could not be exploded without some sort of power source.

Testimony of the Government witnesses also produced factual points concerning the explosive itself. The explosive was a type of commercial dynamite which is normally used in geological work. Such commercial dynamite is manufactured and sold in a cylindrical shape so that it can be deposited easily into a bore hole drilled in rock which is subsequently exploded. Such commercial dynamite is wrapped in wax paper or cardboard and carries warnings concerning its explosive power. Commercial dynamite is never sold in a moldable state packaged in plastic bags. Thus, what the Defendant sold was commercial dynamite which had been transformed from its usual design and shape. Additionally, the market price of dynamite is between $1.00 and $2.00 per pound, and the price of an electric blasting cap can range from thirty-five cents to $1.50. The market price of C–4 was never offered at trial. C–4 is obviously a more powerful explosive than commercial dynamite, however. Dynamite strength is measured by its speed of detonation. Commercial dynamite possesses a velocity of detonation of 13,000 to 17,000 feet per second. C–4 is gauged at 22,000 to 23,000 feet per second. C–4 is preferred by the military in its demolitionary activities because the substance is designed to produce a great deal of force by using only a small amount.

## II. THE MOTION TO DISMISS

Basically, the Defendant contends that the explosive he sold to Agent Valadez cannot be defined as a destructive device under 26 U.S.C. § 5845(f), and *ergo* is not a "firearm" under 26 U.S.C. § 5861. If the Defendant's contentions were accepted as true, the indictment would have to be dismissed. Although the motion raises a genuine and important issue which is the subject of dispute among the Circuit Courts of Appeals and was ably argued by counsel for the Defendant, this Court is of the opinion that the indictment in this case does in fact allege a crime under § 5861.

The Defendant was indicted under 26 U.S.C. §§ 5861(d), (e) and (i) which provide as follows:

It shall be unlawful for any person—
* * * * * *

(d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or

(e) to transfer a firearm in violation of the provisions of this chapter [Chapter 53 of Title 26, U.S.C.]; or

    \*     \*     \*     \*     \*     \*

(i) to receive or possess a firearm which is not identified by serial number as required by this chapter . . . .

The term "firearm" is defined for purposes of the present case under § 5845(a) which states as follows:

(a) Firearm.—The term "firearm" means . . . (8) a destructive device.

A destructive device is defined in pertinent part in §§ 5845(f)(1) and (3):

(f) Destructive device.—The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; . . . and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in [subparagraph] (1) . . . and from which a destructive device may be readily assembled.

The latter statute was a part of a bill entitled the Gun Control Act of 1968, Pub.L. No. 90–618 [hereinafter the "Act"], which was an addition to Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351. Basically, if a device is not inherently a destructive device under § 5845(f)(1), the Government must prove that § 5845(f)(3) is satisfied by showing that a combination of parts would create a destructive device as defined under (f)(1).

The Defendant contends specifically that the explosive sold in the present case is not inherently a "destructive device" as defined under (f)(1). The Defendant then asserts that (f)(3) is inapplicable since the combination of the components supplied to Valadez could not be converted into a destructive device under (f)(1). The Defendant contends that (f)(3) is further inapplicable because it requires that the combination of parts would readily assemble into a destructive device, and in the present case an essential element, i. e., the power source, was lacking. Finally, the Defendant contends that (f)(3) is additionally inapplicable because no intent was shown that the device was "designed or intended" for use as a destructive device.

### A. Applicability of the Act to Commercial Dynamite

The Defendant finds his support predominantly in two opinions, one emanating from the Second Circuit Court of Appeals and the other from a District Court in New York, which is itself contained within the Second Circuit. Of those two cases, the Defendant's strongest one is *United States v. Posnjak*, 457 F.2d 1110 (2d Cir. 1972). In that case, the Defendant had sold 4,000 sticks of unregistered commercial dynamite with unattached fuse and blasting caps to an ATF agent. The Defendant was informed that the dynamite would be resold to Cuban revolutionaries for use in the destruction of buildings and lives. While abhoring the fact that the defendant sold the dynamite with the knowledge that it would be used for socially destructive purposes, the Second Circuit held that no crime had been alleged under § 5861. The Court in *Posnjak* stated that commercial dynamite is inherently not a destructive device. *Id.* at 1116. The Court held that in passing the Act, Congress was concerned with the objectively identifiable weapons of war and "gangster-type" weapons and not with the unlawful use of otherwise legitimate devices. *Id.* As a corollary to this, the Second Circuit held that since a combination of the components in that case would have produced nothing more than otherwise innocent industrial dynamite commonly used for blasting purposes, the Court could not delve into the intent of the use of that material. *Id.* at 1117.

An earlier case which possesses identical reasoning is *United States v. Schofer*, 310 F.Supp. 1292 (E.D.N.Y.1970), a case involving 48 sticks of dynamite with fuse and blasting cap, in which the court held that the statute was aimed specifically at the described articles in (f)(1) and "not at evil perversions of the use of articles of innocent commerce without alteration of their nature or mode of operation . . . ." *Id.* at 1297–98.

However, other Circuit Courts of Appeals which have dealt with cases involving dynamite in its commercial cylindrical form have reached the conclusion that otherwise innocent items may become destructive devices depending upon the user's intent. The Fourth Circuit has dealt with a case involving the existence of four sticks of black powder pellet explosive with unattached blasting caps. That Court in *United States v. Morningstar*, 456 F.2d 278 (4th Cir. 1972), *cert. denied*, 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972), held that under (f)(3), the inclusion or exclusion of the articles from the Act depends on the use for which the materials are intended. *Id.* at 280. Contrary to the Second Circuit's reading of the legislative history, the Fourth Circuit in *Morningstar* was unable to discern a congressional intention limiting the scope of the Act only to military and "gangster-type" weapons. *Id.* at 281. The Ninth Circuit, as well, has determined that sticks of dynamite, copper wire, fuse and blasting caps amounted to a destructive device as defined under (f)(1) because of the defendant's criminal intent to dynamite certain areas of Eugene, Oregon. *See United States v. Oba*, 448 F.2d 892, 894 (9th Cir. 1971), *cert. denied*, 405 U.S. 935, 92 S.Ct. 979, 30 L.Ed.2d 811 (1972). The Eighth Circuit has followed *Oba* in finding that dynamite sticks, fuse and percussion caps placed in gasoline tanks qualify as destructive devices. *See Langel v. United States*, 451 F.2d 957, 962 (8th Cir. 1971). The Seventh Circuit has followed both *Oba* and *Morningstar* in finding that three sticks of dynamite, blasting caps, legwire, a battery and a coil of power cord amounted to a destructive device because of an evil intent.

*See Burchfield v. United States*, 544 F.2d 922, 924, 97 S.Ct. 1602, 51 L.Ed.2d 806 (7th Cir. 1976), *cert. denied*, 430 U.S. 956 (1977). *See also United States v. Greer*, 404 F.Supp. 1289 (W.D.Mich.1975), *aff'd*, 588 F.2d 1151 (6th Cir. 1978) (finding 15 commercial electric blasting caps to be a destructive device).

■ This Court concedes that commercial sticks of dynamite used for their intended purpose of blasting rocks cannot be viewed as destructive devices. The Court, however, must agree with the majority of the circuits that Congress intended to include within the term "destructive device" the combination of commercially usable sticks of dynamite, wires and electric blasting caps when used or intended to be used for antisocial purposes. Although the word "bomb" found in (f)(1) is not defined in the statute, a common definitional use of the word would include within it the above components when intended to be employed for purposes other than legitimate blasting. The Court cannot perceive how such a device used with evil intent could not be one "designed or redesigned for use as a weapon" as required under (f)(3). Although Congress in enacting the Gun Control Act of 1968 was concerned with the use of military and "gangster-type" weapons, there is no indication that the Act was limited to those devices. In fact, it appears that the Act was intended to expand the scope of the definition rather than to limit it. *See* [1968] U.S.Code Cong. & Admin.News, pp. 4410, 4434.

Assuming *arguendo* that the Court in *Posnjak* was correct, it would still not afford any relief to the Defendant in this case. The instant case does not involve sticks of dynamite. Rather, it involves dynamite which has been removed from its commercially usable cylindrical containers transforming it into the brown sticky moldable substance which the Defendant sold as C–4. Under these circumstances, the decisional law clearly indicates that the materials sold by the Defendant amount to a destructive device.

In *United States v. Wilson*, 546 F.2d 1175 (5th Cir. 1977), *cert. dismissed*, 431 U.S. 901, 97 S.Ct. 1690, 52 L.Ed.2d 384 (1977), the Fifth Circuit ruled that a cylindrical object with a six-inch fuse containing dynamite which had been used to destroy a vehicle was a destructive device. The Court in that case held that the purpose of the Act "would be defeated by any interpretation which excluded from coverage homemade bombs having no lawful use simply because one of the components was dynamite . . . ." *Id.* at 1177.

■ In the instant case, Valadez purchased articles which he was told could be assembled for the purpose of destroying a car or house. The moldable dynamite, although still commercial in molecular structure, clearly possessed no capabilities for any commercial or lawful use. Having been transmuted from its commercially feasible and acceptable design, its only reasonable and likely utilization would be that of a homemade bomb.

The Court sees little differentiation in intent and result between the combination of the parts in this case and the combination of a bottle, gasoline and cloth wick which, while innocent as separate entities, together produce a Molotov cocktail. Both devices when used for their intended purposes have absolutely no social or legitimate value. Both are intended only for the wanton destruction of life or property. The cases among the circuits, including the Second Circuit, are uniform in their holdings that homemade devices intended for use in criminal activities are covered by the Act. *See, e. g., United States v. Greer*, 588 F.2d 1151, 1155 (6th Cir. 1978) (stating that Congress intended to outlaw the street varieties of homemade destructive instruments); *United States v. Bubar*, 567 F.2d 192, 201 (2d Cir. 1977), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977) (explaining that *Posnjak* covered only those materials which because of their legitimate use could not meet the objective criterion required under the Act and that dynamite sticks and gasoline drums did amount to a destructive device); *United States v. Curtis*, 520 F.2d 1300, 1304 (1st Cir. 1975) (sticks of dynamite bound to a black box found to be a destructive device); *United States v. Tankersley*, 492 F.2d 962, 966 (7th Cir. 1974) (Molotov cocktail found to be destructive device); *United States v. Peterson*, 475 F.2d 806, 810 (9th Cir. 1973), *cert. denied*, 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 93 (1973) (Congress intended to proscribe "friendly things when with evil intent they are combined or joined together to produce a hostile object or device through the language used in Subsections (a), (f)(3)."); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972), *cert. denied*, 409 U.S. 868, 93 S.Ct. 167, 34 L.Ed.2d 118 (1972) (stating that devices that are enumerated in the Act "have in common usage limited to anti-social purposes.").

In the present case, the Defendant sold commercial dynamite in moldable form to an ATF agent explaining that it could be used to destroy a car or any other chosen object. Additionally, the substance was represented to Valadez as C–4 which is primarily used in the military for purposes of demolition. Once assembled, a moldable explosive, be it C–4 or dynamite, equipped with a fuse and blasting caps employed in a civilian context and sold with the blatant direction that it be used for antisocial purposes, qualifies as a destructive device as it is defined in § 5845(f)(1).

### B. Component Parts

■ The Defendant attempts to evade the sanctions of § 5861 by claiming that no assembled device was sold, and even a combination of the items sold could not be "readily assembled" into a destructive device as defined in (f)(1). Specifically, the Defendant contends that the absence of a power source renders the items sold harmless. The Defendant is correct when he states that an individual must possess all the component parts from which a destructive device could be readily assembled. *See United States v. Malone*, 546 F.2d 1182, 1184 (5th Cir. 1977). *Malone* is distinguishable, however, from the present case. In *Malone*, there was a complete absence of any explosive material, and the decision

was specifically limited to such a situation. The Defendant in the present case not only supplied Valadez with the explosive material, but he equipped the agent with all the necessary component parts. In this case, there was no need for Valadez to purchase the power source. As the Defendant informed Valadez and as Russell Cooper testified at the trial, the device could be armed by wiring it to a car battery. Russell Cooper explained that the firing of the blasting cap which would in turn detonate the dynamite requires a force of only .5 amperes. Since the starting power of an automobile battery is forty amperes, the turning of the key in the ignition would be more than sufficient to detonate the device and cause the destruction of the automobile. Assuming that the object to be destroyed was not a car, the bomber would need nothing more than a 1.5 volt battery to set off the device. In such instances, the energy source is really not essential to the device. *See, e. g., United States v. Greer,* 404 F.Supp. 1289, 1293 (W.D.Mich.1975), *aff'd,* 588 F.2d 1151 (6th Cir. 1978) (battery or static electricity could have set off the blasting caps). The acquisition of a 1.5 volt battery would require no more effort than the acquisition of a match which is the power source of a Molotov cocktail. Based on these factors, the Court concludes that a combination of the parts which were sold by the Defendant would have and were intended to have created a destructive device which could have been readily assembled.

### III. THE FINDING OF GUILT

The Defendant was indicted for a violation of 26 U.S.C. §§ 5861(d), (e) and (i). Section 5861(d) makes it unlawful to receive or possess an unregistered firearm. Section 5861(e) makes it unlawful to transfer a firearm in violation of certain provisions of Chapter 53 of Title 26 of the United States Code which deals with machine guns and other firearms. These provisions entail the payment of a transfer tax, the filing of a written application with the Secretary of the Treasury for the transfer and registration of the firearm, the payment of a making tax and the filing of a written application with the Secretary of the Treasury to make and register the firearm, pursuant to 26 U.S.C. §§ 5811, 5812, 5821 and 5822, respectively.

Government Exhibit 5, which is the sealed certificate provided by the ATF, states that there is no record that the explosive in this case was registered or lawfully acquired by the Defendant. It further provides that the Defendant never made application to make or transfer the explosive nor that he paid the making or transfer tax.

Finally, § 5861(i) makes it unlawful to receive or possess a firearm not identified by a serial number. Agent Wheeler testified under oath that the explosive which Defendant sold to Agent Valadez possessed no such serial numbers.

None of these issues were rebutted in any fashion by the Defendant. Based upon the fact that the items sold by the Defendant could readily be assembled into a destructive device as defined by § 5845(f)(1) pursuant to § 5845(f)(3) and the evidence introduced at trial as detailed above, the Court finds that the Defendant is GUILTY beyond a reasonable doubt of violating those provisions in Title 26 of the United States Code as charged in Counts 1 through 3 of the Indictment filed on October 10, 1978. Therefore, it is hereby

ORDERED that the Defendant's Motion to Dismiss is in all respects DENIED.